Elizabeth LIGHTFOOT,
et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA,
et al., Defendants.

No. CIV.A.01–1484 CKK.

United States District Court,
District of Columbia.

Sept. 24, 2004.

Duncan Norman Stevens, Miller & Chevalier, Chartered, Jeffrey S. Gutman, The George Washington University School of Law, Washington, DC, for Plaintiffs.

Jacques Philippe Lerner, Office of Corporation Counsel, D.C., Washington, DC, Alfred Long Scanlan, Jr., Eccleston & Wolf, P.C., Baltimore, MD, Laura E. Jordan, Law Offices of Laura E. Jordan, P.C., Washington, DC, Andrea Suzanne Marshall, Eccleston & Wolf, P.C., Baltimore, MD, S. Todd Wilson, Eccleston & Wolf, P.C., Baltimore, MD, for Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Currently pending before the Court are Plaintiffs' Motion for Summary Judgment on Counts Six and Seven of the Third Amended Complaint. The Government Defendants and Defendant CLW/CDM filed separate Opposition briefs, and Plaintiffs responded with separate Reply Briefs. This set of filings represents another step in the now three-year struggle by Plaintiffs—a collection of former District of Columbia employees whose disability compensation benefits were terminated, suspended or modified by Defendants—to reform and standardize the District of Columbia's pre-termination process within the strictures of both the District of Columbia Administrative Procedure Act and the Due Process Clause of the Fifth Amendment. Upon a review of the relevant motions, the Court shall grant Plaintiffs' Motion for Partial Summary Judgment.

## I: BACKGROUND

On July 6, 2001, Plaintiffs filed the above-captioned action, initially seeking a preliminary injunction to reinstate their previously-denied disability benefits and to enjoin any future termination of benefits until the District of Columbia instituted a more thorough pretermination process. In a Memorandum Opinion dated October 29, 2001, the Court, while finding a likelihood of success on the merits, denied Plaintiffs' Motion for a Preliminary Injunction for failure to show irreparable injury. *Lightfoot v. District of Columbia*, No. 01–1484, slip op. at 29 (D.D.C. Oct. 29, 2001).

After a series of amendments and discovery-related motions, Plaintiffs filed a Third Amended Class Action Complaint on January 22, 2003. Third Amended Class Action Complaint for Declaratory and Injunctive Relief ("Third Am. Compl."). Named as Defendants were the District of Columbia, and the following who were sued in their official capacities as employees of the District of Columbia: Anthony Williams, Mayor of the District of Columbia; Gregory P. Irish, Director of the District of Columbia Department of Employment Services; Milou Carolyn, Director of the District of Columbia Office of Personnel; and James Jacobs, Director of the District of Columbia Office of Risk Management (collectively, the "Government Defendants"). Third Am. Compl. at ¶¶ 10–14. Also named as a Defendant was CLW/Creative Disability Management ("CLW/CDM"), a private entity with which the District has contractually delegated the power to make determinations on disability compensation claims and to terminate, suspend or modify existing benefit awards. *Id.* at ¶ 15.

Plaintiffs' current Motion for Partial Summary Judgment concerns two counts contained within the Third Amended Complaint. Count VI alleges that Defendants' failure to adopt written and consistently applied standards, policies and procedures governing the termination, suspension and modification of disability compensation benefits violates the Due Process Clause of the Fifth Amendment of the United States Constitution. *Id.* at ¶ 142. Count VII alleges that the Government Defendants' implicit adoption of unwritten practices regarding the termination, suspension or modification of disability benefits without publishing notice in the *District of Columbia Register* and without public comment violates D.C.Code § 2–505. *Id.* at ¶ 144.

## A. Statutory Background

### 1. Overview of the District of Columbia Compensation Act

Under the D.C. Disability Compensation Act ("DCA"), D.C.Code §§ 1–623, *et seq.*, District of Columbia government employees whose injury or death is sustained while in the performance of their duties are entitled to benefits under the Disability Compensation Program. D.C.Code § 1–623.2. In addition to monetary compensation, the District must also provide the beneficiaries medical services, appliances and supplies prescribed or recommended by qualified physicians that have been approved by the Mayor or his designee. D.C.Code § 1–623.3. Generally, to obtain benefits—which range from two-thirds of the employee's monthly pay (for total disability) to two-thirds of the difference between the employee's monthly pay and his/her post-earning monthly wage earning capacity (for partial disability)—the injured employee must (1) provide written notice to his/her supervisor of the disability within thirty days of the injury, D.C.Code § 1–623.19, and (2) make a claim for disability compensation within three years of the date of the injury or death. D.C.Code § 1–623.22.

Upon receipt of a claim, the Mayor or his designee must make findings of fact "as soon as practicable," D.C. Mun. Regs., tit. 7, § 7–1–106.1, following consideration of the claim and any additional investigation. D.C.Code § 1–623.23(a). Additional investigation may involve requiring the allegedly injured employee to submit to an independent medical examination conducted by a physician selected by the District. D.C.Code § 1–623(a). Recognizing that injuries may heal over time, the DCA includes a provision permitting the Mayor or his designee, upon belief that there has been a change in condition, to terminate, suspend, or modify an award of compensation. D.C.Code § 1–623.23(d).

Once a benefit modification has occurred, Section 1–623.24(b) of the DCA provides that a claimant is entitled to a hearing if requested within thirty days of the final decision regarding compensation. D.C.Code § 1–623.24(b). The DCA does not impose a deadline upon which Defendants must convene the evidentiary hearing. With regard to the structure and nature of the adversarial hearing, Section 1–623.24(b) provides generally that the representative of the Mayor shall hold the hearing "in such manner as to best ascertain the rights of the claimant" and "shall receive such relevant evidence as the claimant adduces and such other evidence as he or she determines necessary or useful in evaluating the claim." D.C.Code § 1–623.24(b). Following that hearing, the Mayor or his designee must issue a written decision within thirty days. D.C.Code § 1–623.24(d). Appeal of this decision must be made within thirty days of its issuance, and lies with the D.C. Court of Appeals. D.C.Code § 1–623.28.

## 2. Implementation of the DCA and the Disability Benefits Termination Process

While the Government Defendants have clearly issued regulations governing *initial* claims for benefits, 7 D.M.C.R. Chapter 1, the Government Defendants have admittedly not published rules governing the standards, practices and procedures applicable when disability compensation benefits are terminated, suspended or modified in the *District of Columbia Register.* Third Am. Compl. ¶ 25; Government Defendants' Statement in Opposition to Plaintiffs' Statement of Material Facts as to Which There Exists a Genuine Issue ("Gov't's Opp'n to Pls.' Stmt. of Mat. Facts") ¶ 2 ("We concede that the Program has not published termination procedures . . . ."); Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment on Counts Six and Seven of the Third Amended Complaint, Ex. 2 (Jacobs Dep.), at 226 line 6–12, Ex. 3 (Dailey Dep.) at 192 line 14—193 line 11. Additionally, the Government Defendants have admittedly not published an internal claims procedure manual. Gov't's Opp'n to Pls.' Stmt. of Mat. Facts ¶ 3.

Instead, according to the Government Defendants, the structure and parameters of the benefit modification process for the Disability Compensation Program may be found largely in three discrete locations: (1) the DCA itself; (2) the October 1, 2001, contract between the District of Columbia and Defendant CLW/CDM along with CLW/CDM's companion "Proposal to Support Services for the District of Columbia Disability Compensation Program," Gov't's Opp'n to Pls.' Stmt. of Mat. Facts, Ex. 2 (CLW/CDM Proposal); and (3) the "best practices" of the claims adjustment industry. *Id.* ¶¶ 4–6. According to the Government Defendants, "the adjustment process is a complex and ongoing one that does not lend itself to fixed rules"; as such, "[b]est practices are generally not written . . . they reflect well-established methods of adjustment for weighing evidence, consulting industry reference materials, seeking advice from medical consultants, and engaging in the other steps of adjustment commonly known in the field." *Id.* ¶ 6.[1] In addition to these three sources, the Government Defendants admit that the only other writings that possibly affect the disability benefit modification process are the largely procedural guidelines set out in the Termination of Benefits ("TOB") notice, which provides the first inkling to former beneficiaries that their benefits are being eliminated, and relevant "District of Columbia caselaw." *Id.* ¶ 2.

While the Government Defendants have historically carried out the entire Disability Compensation Program, the District has contracted out the function of actually determining whether to grant or deny claims and whether to terminate, suspend or modify benefits to administrative support companies in recent years. Defendant CLW/CDM assumed this function as third-party administrator on October 1, 2001, as part of a three-year contract with the District.[2] In addition to those sources identified by the Government Defendants as providing the parameters of the Disabil-

---

1. However, the Government Defendants have themselves acknowledged that the term "best practices" often tends to be murky and ambiguous. *See* Gov't's Opp'n to Pls.' Stmt. of Mat. Facts, Ex. 2 (D.C. Office of Risk Management Director Jacob's Dep.) at 50 line 15—51 line 1 ("Best practices are by definition a consensus of what the industry perceives to be its best practices and *that would vary depending on who was doing the analysis of the best practices.*").

2. During the period immediately prior to October 1, 2001, the law firm of Mell, Brownell & Baker administered the Program.

ity Compensation Program, CLW/CDM adds that it has created a draft procedures manual to be used in its administration of the Program. Defendant CLW/CDM's Statement of Genuinely Disputed Material Facts, and Undisputed Material Facts ¶ 8. However, this draft manual has not moved beyond the stage of internal discussions, nor has it been officially adopted. Gov't's Opp'n to Pls.' Stmt. of Mat. Facts ¶ 3.[3]

Importantly, virtually the only paper—or guidelines—that will ever be seen by the Program's beneficiaries and for which the Defendants will be held accountable by the public is the TOB notice itself, *Id.*, Ex. 7 (TOB Notice), a document which fails to include (1) a description of the evidence reviewed in reaching the decision, (2) the legal or evidentiary standard by which the decision is made, (3) guidance on the nature of reconsideration review, (4) the types of evidence or argument acceptable in connection with that review, and (5) notice that the beneficiary may obtain legal representation. Compl. ¶ 42.

## B. Factual Background

Plaintiffs are a collection of former District of Columbia employees injured on the job who are now collecting—or have collected—disability compensation benefits from the District. The gist of Plaintiffs' allegations is that: (1) Plaintiffs' benefits were terminated, modified or reduced without meaningful notice; (2) Plaintiffs were given no pre-termination opportunity to contest the alteration of their benefit status; (3) Defendants modified the status of Plaintiffs' disability compensation benefits without publicly posting the procedures and criteria used by Defendants to determine the appropriate benefit level; and (4) Plaintiffs were given no guarantee that post-termination hearings to contest Defendants' actions would be prompt. The Court will briefly describe the facts attendant to each individual Plaintiff's claim in order to flesh out these general assertions.[4]

Plaintiff Elizabeth Lightfoot[5] alleges that, during her employment as a computer specialist with the District's Department of Consumer and Regulatory Affairs, she was struck in the head and body by a metal partition on March 6, 1991. *Id.* ¶ 50. While Ms. Lightfoot's initial claim for disability benefits was granted, Defendants terminated her benefits on September 22, 1992. *Id.* ¶¶ 50–51. Plaintiff Lightfoot ap-

3. Defendant CLW/CDM's protestation—without any supporting caselaw—that it cannot be liable for due process violations due to lack of decision-making authority is clearly contrary to established precedent. Under Section 1983, private parties may be liable for violations of constitutional rights while acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Defendant CLW/CDM explicitly admits to acting as "an extension of" and "at the direction of" the District of Columbia. Defendant CLW/CDM's Statement of Genuinely Disputed Material Facts, and Undisputed Material Facts ¶ 6; *see also* Third Am. Compl. ¶¶ 17(b), 120–128 (alleging Fifth Amendment Due Process injury due to Defendants actions "under color of state law"). When a private entity acts under color of state law through participation "in joint activity

with the State or its agents", it accepts the boundaries provided by the U.S. Constitution just like the State itself. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *see also West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (third-party doctor employed by State to treat prisoners liable due to exercise of state function).

4. The Court is relying solely on Plaintiffs' allegations found in the Complaint. This process of informally describing the milieu out of which the present conflict arose in no way constitutes fact-finding.

5. Plaintiff Lightfoot passed away in 2003 and will be represented in this suit by her estate. Third Am. Compl. ¶ 64.

pealed this termination, and her benefits were restored on March 8, 1993, though in a reduced amount. *Id.* ¶¶ 52–53. While a hearing on November 10, 1994 upheld this reduction, Lightfoot's subsequent appeals to the now-defunct Employee Compensation Appeals Board proved successful: the Board, through an Order dated July 30, 1996, directed that her benefits be fully restored and any withheld amounts be repaid. *Id.* ¶¶ 54–56. Plaintiff Lightfoot then alleges that on July 25, 2000, and November 27, 2000, she underwent independent medical examinations by two different doctors as ordered by the District of Columbia Disability Compensation Program. *Id.* ¶ 58. Pursuant to a Final Order of Denial received by Ms. Lightfoot on March 6, 2001—but without any prior "Notice of Determination by Examiner" or opportunity to present evidence or argument against termination—Defendants terminated Lightfoot's disability compensation benefits effective March 11, 2001. *Id.* ¶¶ 58, 60. Plaintiff Lightfoot subsequently appealed this termination, and eventually received continued medical benefits as the result of a November 23, 2001, decision by a Department of Employment Services Administrative Law Judge; however, no final adjudication concerning her terminated disability compensation benefits was reached before her death in 2003. *Id.* ¶¶ 60–63.

Plaintiff Juanita Smith asserts that during her tenure as a Senior Corrections Officer with the D.C. Department of Human Services she sustained knee injuries while trying to restrain a detainee from committing suicide. *Id.* ¶ 65. Following her April 23, 2000, injury, Ms. Smith applied for and was awarded disability compensation benefits from the District of Columbia. *Id.* ¶ 66. Following an August 25, 2000, independent medical examination, Plaintiff Smith's benefits were terminated on October 8, 2000, five days after she

received a "Notice of Determination By Examiner" which contained only minimal language from her independent medical report and made no reference to her own treating physicians. *Id.* ¶¶ 67–68, 70. Smith received a "Final Order of Determination" dated November 13, 2000, which confirmed her previous benefits termination. *Id.* ¶ 69. Plaintiff Smith's instant appeal at a hearing on March 6, 2001 proved unsuccessful, though on September 10, 2002, Defendant CLW/CDM issued an order restoring her medical coverage. *Id.* ¶¶ 72–77. However, CLW/CDM terminated Smith's medical benefits one month later, using a form entitled "Order of Compensation Denial/Termination Order" ("DCP–5"). *Id.* ¶ 78. The DCP–5 form is noteworthy for its curt structure, which leaves minimal room for a detailed explanation of the basis of the determination, does not identify or summarize the evidence relied upon in making the determination, and does not inform the former beneficiary of either their right of access to their case file, the nature of reconsideration review or their right to retain counsel. *Id.* ¶ 36. Plaintiff Smith's efforts were successful in December 2002, when the Government Defendants agreed that Ms. Smith was entitled to cash and medical benefits effective August 14, 2002. *Id.* ¶ 79. While Smith's benefits have been restored, she has not received retroactive benefits for the time period relating to her appeals process stretching from October 8, 2000 to August 14, 2002. *Id.* ¶ 79.

Plaintiff Germaine Lee–Williams avers that, while employed by the D.C. Department of Human Services at its Cedar Knolls Youth Detainment Center, she was assaulted by a co-worker on September 3, 1992. *Id.* ¶ 80. Ms. Lee–Williams allegedly suffered an injury to her lower back, for which she was awarded disability compensation benefits for the time period from

November 1992 through June 1999. *Id.* ¶¶ 81–84. Pursuant to an order from the Disability Compensation Program, on June 10, 1999, Plaintiff Lee–Williams underwent examination by an independent medical examiner. *Id.* ¶ 83. While two previous independent medical examiners had concluded that Lee–Williams remained disabled, the new examiner apparently found that Ms. Lee–Williams was capable of returning to work. *Id.* ¶ 83. Thereafter, Plaintiff Lee–Williams received a "Notice of Determination By Examiner" dated June 30, 1999, that—while it did not explicitly specify a date of termination—marked the effective end of her disability compensation benefits. *Id.* ¶ 84. Ms. Lee–Williams' notice contained little more than a statement that she was "capable of returning to [her] pre-injury employment and require[d] no further treatment ...," and made no reference to any medical opinion offered by her treating physicians or previous independent medical examiners with a contrary view. *Id.* ¶ 85. Plaintiff Lee–Williams requested reconsideration of the termination of her benefits on July 29, 1999, but received no further communications from Defendants for a period of nearly 18 months. *Id.* ¶¶ 87–88. Defendants finally responded to Lee–Williams by issuing a January 25, 2001, "Final Order of Denial" that was apparently signed on September 2, 1999, but never mailed; this "Final Order of Denial" provided no additional rationale for her benefits termination other than to say her denial was based on other findings not provided to Lee–Williams. *Id.* ¶ 88. Plaintiff Lee–Williams subsequently filed a request for a hearing to appeal the termination of her benefits, which was held on July 11, 2001. *Id.* ¶ 89. Subsequently, the Administrative Law Judge dismissed her request for a hearing as "untimely." *Id.* Ms. Lee–Williams then appealed this dismissal to the Director of Employment Services, who reversed and remanded that decision. *Id.* ¶ 91. At the time pleadings were filed, Plaintiff had not yet received a decision from her January 6, 2003, hearing and remained without disability benefits. *Id.*

Plaintiff Frank M. Fishburne, Sr., contends that during his tenure as an Emergency Medical Technician ("EMT") with the District, he suffered a permanent partial disability as the result of a July 2, 1994 motor vehicle accident during his service. *Id.* ¶ 92. Mr. Fishburne received disability compensation benefits from the District from August 16, 1994 to late 1998. *Id.* ¶¶ 93–94. On September 23, 1998, Defendants ordered Plaintiff Fishburne to undergo an independent medical examination. *Id.* ¶ 94. Based upon what Mr. Fishburne alleges was an insufficient examination, Defendants issued a "Compensation Denial/Termination Order" on November 20, 1998, which discontinued Fishburne's benefits. Plaintiff Fishburne's request for reconsideration was denied without explanation, though—as a result of Fishburne's repeated requests—a hearing was held to review his final termination order on August 4, 1999. *Id.* ¶¶ 95–96. On January 20, 2000, the hearing officer issued his recommended decision, which was adopted on the same day by the Interim Assistant Director for Labor Standards as the "Final Compensation Order." *Id.* ¶ 97. The Final Compensation Order rejected Defendants' determination of Mr. Fishburne's status *in toto* and directed (1) a continuation of Fishburne's total disability compensation benefits, (2) a retroactive award of total disability compensation benefits for the period of withholding, and (3) granted full medical expenses reasonably related to Fishburne's injuries. *Id.* ¶ 100.

Due to the District's failure to implement the Final Compensation Order, Plaintiff Fishburne filed a Petition for Writ of Mandamus with the D.C. Court of Appeals on June 9, 2000. *Id.* ¶ 101. Mr. Fishburne emerged triumphant in his quest, ultimately receiving his award of benefits and retroactive payment in August 2000. *Id.* ¶ 102. In the spring of 2001, Defendants compelled Fishburne to undergo another independent medical examination, as well as an evaluation with a vocational rehabilitation specialist. *Id.* ¶ 103. Through a letter dated May 9, 2001, Plaintiff Fishburne received notice that the Disability Compensation Program had determined that he had reached "maximum medical improvement" and referred Fishburne for job placement with Vocational Assessment Services, Inc. to perform some sedentary tasks. *Id.* ¶ 104. After Fishburne obtained part-time employment, Defendant CLW/CDM issued a DCP–5 reducing his disability compensation benefits on the grounds that he was no longer totally disabled. *Id.* ¶ 105. Like the other named plaintiffs, the DCP–5 afforded Fishburne no opportunity to provide information or seek reconsideration prior to the reduction of his benefits. *Id.*

Plaintiff Lawrence Myers maintains that as an employee of the D.C. Public Schools, he sustained a severe injury to his back in March 1990. *Id.* ¶ 106. Mr. Myers requested and received total disability compensation benefits for most of the period stretching from March 1990 to March 2002. *Id.* ¶ 107. On March 11, 2002, Myers' disability benefits were terminated with no notice, and only a subsequent Form DCP–5 Final Termination Order dated March 20, 2002 gave any indication of the facts surrounding his benefits termination. *Id.* ¶ 108. Mr. Myers' request for reconsideration was denied by Final Order

dated May 23, 2002. *Id.* ¶ 110. A formal hearing at the Department of Employment Services was held before an Administrative Law Judge on November 5, 2002, but—at the time of filing—no decision had been issued and Myers remained without benefits. *Id.* ¶ 111.

The final named plaintiff, Mr. Jamal Rashad, claims that he suffered a recurrence of a disabling condition in March 1996 precluding any continued employment with the D.C. Office of Corporation Counsel. *Id.* ¶ 112. Mr. Rashad applied for and received disability compensation benefits for the next six years. *Id.* Mr. Rashad's odyssey into the labyrinths of bureaucracy began in January 2002 via a request by Defendant CLW/CDM that he undergo an independent medical examination. *Id.* ¶ 113. Rashad's continued requests for a copy of this independent medical examination report have gone unheeded by CLW/CDM. *Id.* By a letter dated November 12, 2002, CLW/CDM, through its claims adjuster, required that Plaintiff Rashad submit to another independent medical examination with a physician (1) whose office is located over eighty miles from Rashad's home and (2) who had previously examined Rashad. *Id.* ¶ 114. Mr. Rashad immediately informed the adjuster of his objections to the distance and physician selected in a letter dated November 21, 2002, but expressly consented to an independent examination by another doctor. *Id.* After the adjuster failed to return Rashad's phone calls or correspondence, Rashad did not attend the examination. *Id.* Defendants' next communication with Plaintiff Rashad was on January 4, 2003, in the form of a Notice of Intent to Terminate Disability Compensation Payments dated December 27, 2002, for failure to attend an independent medical examination and failure to

complete timely various forms.[6] *Id.* ¶ 116. Mr. Rashad promptly filed a request for reconsideration in the two-day limitations period he was given after receipt of the Notice. *Id.* ¶ 117. Despite his request for reconsideration and the restatement of his willingness to submit to an independent medical examination, the claims adjuster has refused to rescind the Notice and Rashad's bi-weekly checks have been delayed. *Id.* ¶¶ 117, 118.

## II: LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). Under the summary judgment standard, Plaintiffs, as the moving parties, bear the "initial responsibility of informing the district court of the basis for [their] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [they] believe[ ] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Defendants, in response to Plaintiffs' motion, must "go beyond the pleadings and by [their] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242–43 (D.C.Cir.1987); *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F.Supp. 46, 49 (D.D.C.1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed.R.Civ.P. 56(e)) (emphasis in original).

## III: DISCUSSION

### A. Plaintiffs' Due Process Claim (Count VI)

Plaintiffs' central claim is that fundamental aspects of the Disability Compen-

---

**6.** This termination notice might well be in violation of D.C.Code § 1–623.23(d), which permits the Defendants only to suspend, rather than terminate, benefits if the employee "refuses to submit to or obstructs an examination."

sation Program invite inconsistent application at best and arbitrariness at worst. Pls.' Mem. of P. & A. in Support of Corrected Mot. for Summ. J. on Counts Six and Seven of the Third Am. Compl. ("Pls.' Mem.") at 15. In the absence of written guidelines governing the termination, modification or reduction of benefits, Plaintiffs assert that Defendants' discretion is untethered and unbounded: beneficiaries are left unaware of why an examination is ordered and what weight it is given, what information (if any) is to be shared with them by claims adjusters prior to termination or modification of beneficiaries' benefits, and what standards govern the possible restoration of benefits on appeal. *Id.* Defendants have two basic responses to Plaintiffs' contention: (1) the creation of written "rules" for every significant aspect of governmental operations would be burdensome to an extent not contemplated by the Due Process Clause, and (2) while many of the "best practices" employed by the Defendants are either unwritten or only vaguely confined by written documents and contracts, the general lack of written guidelines does not mean such guidelines do not exist; rather, disability benefit analyses are made following nationally recognized methods in a manner that is neither ad hoc nor arbitrary. Defs.' Br. in Opp'n to Pls.' Mot. for Summ. J. at 8–10.

If Due Process is to mean anything, it is a fundamental guarantee that stakeholders are provided both sufficient notice and fair procedures when governmental discretion mandates the abrogation

of their rights or privileges.[7] The central purpose of the Due Process clause is to ensure the *accountability* of the government and its administrative agencies to its citizenry: while discretion is certainly permitted, administrators must provide a public framework for principled decision-making and create clear boundaries for that discretion. "Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible." *Envtl. Def. Fund, Inc. v. Ruckelshaus,* 439 F.2d 584, 598 (D.C.Cir.1971). "Discretionary decisions should more often be supported with findings of fact and reasoned opinions." *Id.* Moreover, while judicial review is certainly an important element of the administrative process—as evidenced by Defendants frequent reminders that they are constrained by "caselaw"—"[j]udicial review can only correct the most egregious abuses." *Id.* Instead, Due Process is best achieved when the integrity of the administrative process is maintained through a framework of publicly available rules and guidelines that provide an opportunity for comment and criticism. The idea that an administrative agency must provide a reasoned explanation using preordained standards serves a threefold purpose:

[1] enabling the court to give proper review to the administrative determination; [2] helping to keep the administrative agency within proper authority and discretion, as well as helping to avoid and prevent arbitrary, discriminatory, and irrational action by the agency; and

---

7. Courts undertake a two-pronged analysis of any Due Process issue. First, the Court must determine whether Plaintiffs possess a property interest which is entitled to protection under the Due Process Clause. Second, and "[o]nce it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481,

92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The Court, in an earlier opinion, found that Plaintiffs did possess a property interest in their disability benefits. *Lightfoot,* No. 01–1484, slip op. at 21. Thus, the Court will move directly into an analysis of what process is due Plaintiffs.

[3] informing the aggrieved person of the grounds of the administrative action so that he can plan his course of action (including the seeking of judicial review). *Matlovich v. Sec'y of the Air Force,* 591 F.2d 852, 857 (D.C.Cir.1978).

The D.C. Circuit has consistently approved of "rulings invalidating administrative action because the agency had no articulated standards governing its discretionary determinations, or requiring the adoptions of such standards." *Id.* at 857 n. 11; *see also Pollack v. Simonson,* 350 F.2d 740, 742 (D.C.Cir.1965) (an agency's consideration of liquor licenses must be guided by "specific public standards, not unbridled discretion"); *Armstrong v. District of Columbia Pub. Library,* 154 F.Supp.2d 67, 82 (D.D.C.2001) (regulation was so imprecise and amorphous that it left unbridled subjective discretion to whomever was enforcing the rule at the time). In addition, other Circuits have explicitly recognized that Due Process requires written standards whose availability provides notice to the interested public. *See, e.g., White v. Roughton,* 530 F.2d 750, 754 (7th Cir.1976) (state welfare program's use of unwritten personal standards of eligibility struck down because "fair and consistent" application of eligibility requirements mandates "written standards and regulations"); *Holmes v. New York City Housing Auth.,* 398 F.2d 262, 265 (2d Cir.1968) ("[d]ue process requires that selections among applications [in a housing program] be made in accordance with ascertainable standards") (cited with favor by *Matlovich* ); *Martinez v. Ibarra,* 759 F.Supp. 664, 668 (D.Colo. 1991) (due process denied when the procedure for reviewing Medicaid application "is never articulated in clear, written standards" and no "significant regulations" constrains the organization conducting medical evaluations); *Baker–Chaput v. Cammett,* 406 F.Supp. 1134, 1140 (D.N.H.1976) ("[T]he establishment of written, objective, and ascertainable standards is an elementary and intrinsic part of due process.").

The D.C. Court of Appeals—in three major decisions—also has recognized the need for ascertainable, written standards in benefits programs and government decision-making. In *Miller v. District of Columbia Bd. of Appeals & Review,* 294 A.2d 365 (1972), the court highlighted "the danger of arbitrary administrative action based upon unarticulated and unannounced standards." *Id.* at 369. The court warned that "unless there are some standards relating the prior conduct of an applicant to the *particular* ... activity for which he seeks a license [to sell costume jewelry], the power to deny a license inevitably becomes an arbitrary, and therefore unlawful, exercise of judgment by one official. ..." *Id.* In *Woods v. District of Columbia Nurses' Examining Bd.,* 436 A.2d 369 (1981), the court held that the rules governing the petitioner's application for reinstatement as a psychiatric nurse were void for vagueness under the *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), doctrine propounded by Justice Douglas. The *Woods* court's description of the regulation in question is demonstrative for the case at hand:

> It is difficult to imagine a regulation that would require more guess-work on the part of an applicant. [It] contains no clues as to what grounds the Board might consider "satisfactory" or what criteria might be relevant to the Board's decision. The Board is apparently free to decide what is satisfactory on a purely subjective, ad hoc basis.

*Woods,* 436 A.2d at 374. Finally, in *Aikens v. District of Columbia Dept. of Hous. & Cmty. Dev.,* 515 A.2d 712 (1986),

the court found that the termination of housing assistance benefits due to a violation of the agency's "duty to cooperate" provisions of the HUD Handbook violated due process. *Id.* at 719. Importantly, even though the petitioner was informed by a written rule that "failure of the family to cooperate is a ground for terminating assistance," the *Aikens* court still found that the disputed guideline failed to provide the requisite notice because it did not specify the time limit for supplying requested documents. *Id.*

Sheer volume of precedent establishing the need for written, publicly available guidelines to give the interested beneficiaries of government programs proper notice about their rights and responsibilities, Defendants suggest that they are permitted to evade this check on arbitrary decisionmaking because "*plaintiffs have failed to point to evidence showing that a single plaintiff or member of the putative class has been treated in [an arbitrary] manner.*" Defs.' Br. in Opp'n to Pls.' Mot. for Summ. J. at 9. Defendants take a "trust us" approach by relying on "well-established" but unwritten methods of adjustment that very well may be "adjusted" any time an individual complains about his/her treatment. In doing so, Defendants attempt to paint Plaintiffs into an impossible corner where Plaintiffs cannot show that they have been treated in an ad hoc, arbitrary manner because they have nothing solid against which to compare their treatment: without written standards and an understanding for the rationale of the decision to deny their disability benefits, Plaintiffs would appear to have obvious difficulties pointing to legal and factual error. Rather than follow Defendants' ill-advised lead, the Court follows Shakespeare's ad-

monition: "Fish not, with this melancholy bait/For this fool-gudgeon, this opinion." William Shakespeare, *The Merchant of Venice*, Act i., Sc. 1, line 107–08.

■ Defendants fundamentally misunderstand Plaintiffs' claim. The issue currently before the Court is not whether the government's adjusters consistently and properly exercise professional expertise, or whether the District's "unwritten rules" conform to those commonly used in the industry.[8] Instead, the issue before the Court is purely legal: whether Due Process demands that notice and the potential for arbitrary decision-making requires that written policies and procedures exist to limit discretion and guide the termination, suspension or modification process. In this regard, the precedents are quite clear: the courts must focus on the *potential* for harm inherent in unbridled decision-making. *See Woods*, 436 A.2d at 375 ("[w]ithout articulated standards to guide the Board's discretion, any hearing would be meaningless; petitioner would have no notice of what she would be required to prove"); *Miller*, 294 A.2d at 369 (due process requires clarification of the guidelines necessary to issue a business standard to avoid arbitrary administration).

Written standards are the most important and valuable check against the potential for arbitrary administration: they act as explicit, bedrock guides for the actions of decisionmakers and ensure that benefit programs are administered in a consistent and transparent manner. Defendants apparently recognize the prophylactic benefits of written standards, and attempt to reassure the Court that enough written standards exist regarding the termination, suspension or modification or disability benefits that—while the "best practices"

---

8. Moreover, the point Defendants ignore is that what might be a legitimate practice for the management of private programs might run afoul of the Due Process protections afforded public employees.

employed are not written—the program still passes constitutional muster. Defs.' Br. in Opp'n to Pls.' Mot. for Summ. J. at 10 (citing the written requirements in "Program Directives, caselaw, the [DCA], the DCMR, and the contract [between the District and CLW/CDM], including both the [Request for Proposal] and RFP response"); Opp'n of Def. CLW/CDM to Pls.' Mot. for Summ. J. at 4 (" 'Best Practices' are written" in a draft manual provided to the District). Defendants' repeated citations to any and all possible sources that happen to capture some reference to the Disability Compensation Program are unavailing: virtually every written instrument raised by Defendants contains minimal or no reference to the termination, modification or suspension processes *and* is not accessible to the disability benefit stakeholders whose interest in such guidelines is paramount.[9]

Defendants apparently misunderstand that standards must not only be written but also *published* to the interested public in order to be meaningfully enforceable. Without specific, publicly articulated principles with which to judge the government's administration of its programs, affected parties have no way of knowing in any given case what their rights and privileges are, what procedural steps must be taken to ensure those rights and privileges, and if the government is following its own rules. *See Aikens*, 515 A.2d at 719 (the fact that the regulation generally referring to the matter was written in a handbook and administrative plan was not enough for Due Process; materials must supply specific information outlining proce-dural timeline when denial of benefits is at stake). As presently constructed, Defendants' system of terminating the disability benefits enjoyed by Plaintiffs and other public employees gives no hint as to possible opportunities for beneficiaries to provide claims adjusters with information prior to this decision, nor does it provide any explicit clues as to the evaluation protocols and data weighting employed in the termination decision process, nor does it furnish any glimmer of insight into the standards of review for such decisions or the post-termination procedural rights of the beneficiaries. As such, this largely unwritten system full of guesswork and innuendo fails to meet the strictures of Due Process. Instead of fair process, the current Disability Compensation Program provides only insufficient notice, opaque standards of review, and undetectable procedure to Plaintiffs and other similarly situated individuals. Indeed, Defendants' methodology is reminiscent of a rogue Department of Motor Vehicles seizing the licenses of drivers without ever informing them of the point system based on alcohol and traffic infractions that determines the status of their property interest. *Cf. Babazadeh v. District of Columbia Hackers' License Appeal Bd.*, 390 A.2d 1004, 1007–08 (D.C. 1978) (license regulation rules failed to contain explicit standards regarding decisions to suspend or revoke a cab driver's license and thus ran afoul of Due Process).

The Court notes that Due Process may well be met if Defendants are able to articulate their "best practices" and other rules regarding termination, suspension or modification of benefits in writing and in a

---

9. Defendants also talk out of both sides of their mouth on this issue. While stressing the allegedly wide array of written rules binding the administration of the Disability Compensation Program when dealing with Count VI's Due Process claim, Defendants, when faced with Count VII's DCAPA claim, then assert that these same writings—which consist of mainly informal internal guidelines, memos and manuals—are not "rules" because they are unenforceable and may not be challenged. Such a vacuum of accountability is clearly untenable.

manner accessible to both the public and the interested stakeholders. These rules should be given to individuals receiving disability benefits at both the commencement of their benefits and at any stage in which those benefits are in jeopardy of termination, modification or suspension. Taking Plaintiffs' suggestion, the Court notes that Defendants should strongly consider including explicit written guidelines relating to:

- What regular opportunities do beneficiaries have to provide medical or vocational information to a claims adjuster prior to a decision to terminate, suspend or modify disability benefits?

- What are the protocols that govern the independent medical evaluation—when, why, and where one is performed—and the content of the resulting report?

- What weight is assigned to the independent medical evaluation v. the opinion or the treating physician, and does the treating physician have an opportunity to comment on the independent medical evaluation before a decision is made?

- Does the beneficiary have the right to access his/her file before the termination decision? What deadlines must the third party administrator follow once file access is requested?

- May a terminated beneficiary retain counsel, and does their attorney have the same right to review the beneficiary's file in order to prepare necessary argument?

- What standards are employed in making the termination decision, and what weight is afforded each piece of information before the adjuster?

- What standard of review is employed on reconsideration and appeal?

- What is the specific timeline for reconsideration and appeal?

- Are there extensions of time for good cause if a personal or other emergency prevents a beneficiary from responding to a termination notice in the outlined time period?

- What kinds of information may beneficiaries submit in response to a notice that their benefits will be terminated?

- Under what circumstances are benefits paid pending reconsideration subject to recoupment, and what are the procedures by which a beneficiary may seek a waiver?

Rather than being burdensome to an extent not contemplated by the Due Process Clause, these small changes to the current system may provide the requisite notice and accountability essential for fair process. When a property interest is subject to termination, suspension or modification, government must make the "implicit" explicit and provide stakeholders with transparent guidelines and accountable administration. Accordingly, the Court concludes that the District's program violates Due Process and shall grant Plaintiffs summary judgment on this count.

### B. Plaintiffs' District of Columbia Administrative Procedure Act Claim (Count VII)

The District of Columbia Administrative Procedure Act ("DCAPA") imposes certain restrictions on the administrative programs created and directed by Government Defendants. One such requirement reflects the need for notice before the adoption, amendment or repeal of agency rules: "[t]he Mayor and each independent agency shall, prior to the adoption of any rule ... publish in the District of Columbia Register ... notice of the intended action so as to afford interested persons opportunity to submit data and views ei-

ther orally or in writing." D.C.Code § 2–505(a). Publication of the proper notice must be made "not less than 30 days prior to the effective date of the proposed adoption, amendment, or repeal." *Id.* Plaintiffs' central contention is that Defendants' unwritten "best practices" employed the disability benefit termination, suspension or modification process amount to rules governing the Disability Compensation Program's administration; as such, publication for notice and comment purposes is required by the DCAPA—a step Defendants' have admittedly failed to take.

What constitutes a "rule" triggering the notice requirement is also defined by the DCAPA: a "rule" is "the whole or any part of any Mayor or agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of the Mayor or of any agency." D.C.Code § 2–502(6)(A). The D.C. Court of Appeals has traditionally instructed that the term "rule" be interpreted broadly. *District of Columbia v. North Washington Neighbors, Inc.,* 367 A.2d 143, 147 (D.C.1976) ("the definition of a 'rule' under the DCAPA is certainly broad"). While there "are no rigid formulas for determining when an official action results in a 'rule' for the purposes of the DCAPA," *Acheson v. Sheaffer,* 520 A.2d 318, 320 (D.C.1987), the D.C. Court of Appeals has repeatedly held that policies and procedures governing aspects of public benefit programs are rules. *See, e.g., id.* at 321 (policy decisions "directed towards the general public" subject to rule-making procedures of DCAPA); *Milk Indus. Found. v. Glickman,* 949 F.Supp. 882, 893–94 (D.D.C.1996) (APA defines "rule" broadly and cannot be evaded by calling it

something else; it is "the substance of what the [agency] ... has done which is decisive"); [10] *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,* 710 F.2d 842, 846 (D.C.Cir.1983) (the APA's definition of "rule" is "broad enough 'to include nearly every statement an agency may make'"); *Batterton v. Marshall,* 648 F.2d 694, 700 (D.C.Cir.1980) ("The breadth of this definition cannot be gainsaid."); *Webb v. District of Columbia Dep't of Human Serv.,* 618 A.2d 148, 151 (D.C.1992) (practices "implementing the Mayor's or DHS's policies governing its homemaker services program fall within the statutory definition of a rule"); *Rorie v. District of Columbia Dep't of Human Res.,* 403 A.2d 1148, 1153 (D.C.1979) (regulations determining eligibility for emergency assistance benefits were "rules" under the DCAPA).

This plethora of cases clearly demonstrates that policies regarding eligibility for benefit programs are "rules" defined by the DCAPA. The reasoning employed by these decisions—that entrance guidelines necessary to commence a benefits program are "rules"—is no less applicable to the exit process for those same benefits. The Government Defendants have recognized as much in separate contexts as other District agencies have published regulations governing termination procedures. *See, e.g.,* D.C. Mun. Regs. tit. 29 § 1300–1399.1 (1987) (Medicaid Program); D.C. Mun. Regs. tit 29 § 201 (1987) (Blind Vendors Program); D.C. Mun. Regs. tit. 29 § 306 (1987) (Child Development Facilities); D.C. Mun. Regs. tit. 7 § 216 (1986) (Private Sector Workers' Compensation Program). Here, the governing statute, D.C.Code § 1–623.24, is virtually silent on the procedures for terminating, modifying or suspending benefits: there has been a

---

**10.** The DCAPA is "generally to be interpreted akin to the federal APA." *Timus v. D.C. Dep't*

*of Human Rights,* 633 A.2d 751, 780 n. 2 (D.C.1993).

complete delegation of authority to the agency to develop these standards and procedures.[11] Thus, in the absence of City Council action, any procedures developed by Defendants reflect policy determinations for both (1) implementing, interpreting, and prescribing law *and* (2) describing procedural and practice requirements. This policy determination process—which Defendants are clearly undertaking when setting out unwritten termination, suspension and modification procedures which affect Plaintiffs' property interests—is clearly substantive rule-making. *See Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C.Cir.1997) ("[A] substantive rule modifies or adds to a legal norm based on an agency's own authority ... because the agency is engaged in lawmaking [ ] the APA requires it to comply with notice and comment").

Defendants attempt to escape from this wealth of evidence and analysis by relying on two assertions: (1) they assert that the panoply of cases dealing with public benefits programs are inapposite in the disability benefits context because the only recipients of the Disability Compensation Program are government workers, not the general public, Defs.' Br. in Opp'n to Pls.' Mot. for Summ. J. at 14–15, and (2) they maintain that because the unwritten, unpublished "best practices" apply only to government workers, then the procedures are for non-binding "internal use only" and cannot possibly fall under the DCA's definition of a "rule." *Id.* at 13–14. Both of the arguments employed by Defendants are fundamentally unavailing.

With regard to Defendants first contention—that rules affecting only public employees are not covered by the DCAPA— Defendants cite no statutory or common law exception in the DCAPA for rules governing programs created solely to govern the benefit or conduct of public employees. Moreover, the Government Defendants have not generally acted as though such an exception exists. Indeed, the Government Defendants have promulgated and published Rules of the Public Employee Relations Board, 6 D.C.M.R. Ch. 5; Rules and Regulations of the Office of Employee Appeals, 6 D.C.M.R. Ch. 6; Employee Conduct guidelines, 6 D.C.M.R. 18; Reductions in Force procedures, 6 D.C.M.R. 24; Defined Contribution Pension Plan regulations, 6 D.C.M.R. Ch. 26; and Rules of Practice and Procedure for the Police and Firefighters Retirement and Relief Board, 6 D.C.M.R. Ch. 25. If the City Council had wanted to treat city workers differently from all other citizens, it could have expressly done so in the DCAPA. A plain reading of the relevant provisions of the DCAPA indicates that it did not do so. *Compare* 5 U.S.C. § 553(a)(2) (federal APA provision exempting matters relating to agency management or personnel). Employees serving the District of Columbia, like all members of the public, are entitled to participate in rule-makings that affect them and must be given adequate notice of the procedures and policies that affect their substantive property interests.

Defendants' second contention—that the guidelines governing termination, suspension or modification of benefits are "internal" and therefore are not "rules" subject to the DCAPA's notice requirements—is

---

**11.** As noted previously, *supra* at 81, the District has issued detailed regulations regarding the eligibility requirements for benefits and the procedures and standards for initiating claims under the Disability Compensation Program. *See* D.C. Mun. Regs. tit. 7 §§ 100 *et seq.* The entrance regulations include explanations on the procedures for submitting claims, the process for appealing rejected claims, and orders for physical examinations. D.C. Mun. Regs. tit. 7 §§ 104–15.

also groundless. Once again, Defendants fail to cite any provision of the DCAPA adopting such an "internal v. external" distinction. Moreover, the cases cited by defendants dealing with such "internal" guidelines that did not require publishing are wholly inapposite to the current case. Suicide prevention plans, *Clark v. District of Columbia,* 708 A.2d 632 (D.C.1997), ambulance dispatch prioritization regulations, *Wanzer v. District of Columbia,* 580 A.2d 127 (D.C.1990), and autopsy protocols, *Stath v. Williams,* 174 Ind.App. 369, 367 N.E.2d 1120 (1977) are merely directives for *how public employees should conduct their jobs,* and *are not rules for what procedures the government must take when impacting their property interests.*

*Teachey v. Carver,* 736 A.2d 998 (D.C. 1999), is perhaps most instructive on the distinction between when a directive is an internal guideline that does not require publication, and when it is considered a "rule" requiring publication. The *Teachey* court defined "an internal agency practice and procedure" as being "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights or interests of affected parties." *Id.* at 1005 n. 8 (citing *Batterton v. Marshall,* 648 F.2d 694, 702 n. 34 (D.C.Cir.1980)). As is the case here, when the government's policies and procedures directly affect the substantive property rights and procedural interests of those whom the program is designed to serve and benefit, those policies can hardly be characterized as "internal." Indeed, the broad language of the statute in question, which grants a right of even unaffected members of the public to comment on an "agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," D.C.Code § 2–502(6), guards against a reading of an "internal v. external" distinction.

With no exception available, Defendants' reliance on unwritten "best practices" and unpublished procedures to guide the Disability Compensation Program constitutes rule-making under the DCAPA. It is undisputed that Defendants did not provide notice or opportunity for comment prior to implementing these policies. The rules governing the termination, suspension or modification of Plaintiffs' disability compensation benefits therefore were promulgated unlawfully. *See Petties v. District of Columbia,* 298 F.Supp.2d 60, 66–67 (D.D.C.2003) (District of Columbia Public School Program's new system of paying private providers based on student attendance criteria was a "rule" promulgated unlawfully for lack of notice and comment); *Junghans v. Dep't of Human Res.,* 289 A.2d 17, 23 (D.C.1972) (agency order implementing the reduction of public assistance payment levels invalid for failure to follow rule-making notice requirements); *Webb,* 618 A.2d at 151 ("Since it is conceded that the eligibility guidelines used to deny benefits in this case were not promulgated in compliance with the DCAPA, the agency's action based on the guidelines is invalid."); *Rorie,* 403 A.2d at 1154 (application for emergency services denied on the basis of improperly promulgated guidelines "must ... be evaluated as though the invalid regulation had not existed"). To take proper effect in the future, Defendants' termination, suspension or modification of the disability benefits of Plaintiffs' and other government employees must take place according to the notice and comment procedures outlined in the DCAPA. *See* D.C.Code § 2–505(a).

Based on the foregoing, the Court concludes that Plaintiffs' Partial Motion for Summary Judgment on Counts VI and VII of the Third Amended Complaint must be granted. Defendants' current system of administering the Disability Compensation

Program for former District employees through unwritten "best practices" and vague, unpublished internal directives fails to provide the kind of notice and accountability required by Due Process to check arbitrary decision-making. Moreover, Defendants failure to follow the publication requirements of the DCAPA also renders these rules unlawful. With Plaintiffs' important property interest in their benefits at stake, proper implementation of the District's rules regarding the termination, suspension or modification is a necessity. As such, the Court shall grant Plaintiff's Motion for Summary Judgment on Counts VI and VII of the Third Amended Complaint.

## IV: REMEDY

The Court's grant of summary judgment in favor of Plaintiffs on Counts VI and VII of the Third Amended Complaint voids the unpublished procedures used by Defendants to terminate, modify or suspend Plaintiffs' disability compensation benefits. Such a finding awards the prospective relief requested by Plaintiffs, and terminates the Court's jurisdiction as to prospective matters in this case. The task of fulfilling the criteria set forth by the Court and legitimating the Defendants' termination rules is therefore remanded to the relevant District of Columbia agency for discussion, promulgation, and eventual publication.[12]

■ The Court's finding that the Defendants' unpublished policies are void has

interim implications as well.[13] The remedy available for aggrieved parties under these circumstances is not limited to remand to the agency for rule-making. *See, e.g., Webb,* 618 A.2d at 151–52; *Rorie,* 403 A.2d at 1154. Rather, the Court shall order that the disability compensation benefits, both cash and medical, of all members of the Plaintiff class be reinstated as of the date of this Opinion and Order until individualized termination, modification, or suspension determinations may be made under validly promulgated rules. Such an order to reinstate benefits is in line with past precedent. *Webb,* 618 A.2d at 152 (proper remedy was reinstatement of benefits pending a determination of continued eligibility under properly promulgated procedures); *Aikens,* 515 A.2d at 719 (remand with instructions to reinstate benefits as well as to develop rules governing recertification process for housing benefits).

There still exists the issue of possible retroactive relief for Plaintiffs to recover monies for the period stretching from the date of the termination, modification or suspension of their benefits to the date of this Opinion and Order. The Court refers the parties to Magistrate Judge Facciola of the United States District Court for the District of Columbia for possible resolution of this matter. The Court sets a date of November 29, 2004, at 9:00 A.M. for a status hearing in front of this Court for parties to provide an update of these discussions.

---

**12.** The Court notes that the Government Defendants have attempted several "post hoc" modifications to the disability termination process. *See* Gov't Def. Opp'n to Pls.' Mot. for Prelim. Inj. at 6 (describing new "grace period" policy which apparently was not implemented); Third Am. Compl. ¶¶ 39–41 (discussing new TOB Notice). These post hoc changes still run afoul of the notice requirement embodied in the Due Process Clause and the DCAPA and are therefore void.

**13.** This point was well-briefed by Plaintiffs. *See* Pls.' Mem. at 12–14; Pls.' Reply to Opp'n of Gov't Defs. to Pls.' Mot. for Summ. J. at 11–12. In its briefing, the Government chose not to respond to this issue. Having reviewed the cases proffered by Plaintiffs, the relevant filings, and additional research, the Court makes its findings.

## V: CONCLUSION

Based on the reasoning detailed above, the Court shall grant Plaintiffs' Partial Motion for Summary Judgment on Counts VI and VII of the Third Amended Complaint. The prospective relief portion of this case is therefore remanded to the relevant District of Columbia agency in order to generate and publish valid rules concerning the termination, modification or suspension of disability compensation benefits. Plaintiffs' benefits are hereby restored until valid guidelines are promulgated and individualized determinations are made. Issues concerning retroactive relief are referred to the Magistrate Judge for mediation. An appropriate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 24th day of September, 2004, hereby

**ORDERED** that Plaintiffs' Motion for Summary on Counts Six and Seven of the Third Amended Complaint [122, 123] is GRANTED; it is further

**ORDERED** that the obligation to promulgate fair and validly published benefit program rules is REMANDED to the relevant District of Columbia agency; it is further

**ORDERED** that Plaintiffs' cash and medical disability compensation benefits are REINSTATED as of the date listed below; it is further

**ORDERED** that the case be REFERRED to Magistrate Judge Facciola for mediation concerning any retroactive relief; it is further

**ORDERED** that the parties are to appear in front of this Court at 9:00 A.M. on November 29, 2004, for a status conference regarding the progress of this matter.