**Martha Mae RORIE, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPART-
MENT OF HUMAN RESOURCES,
Respondent.**

**No. 12792.**

District of Columbia Court of Appeals.

Argued Oct. 12, 1978.

Decided June 27, 1979.

Dalton J. Howard, Jr., Washington, D. C., with whom Gerald W. Von Korff and Laura W. S. Macklin, Washington, D. C., were on the briefs, for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Washington, D. C., at the time the brief was filed, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for respondent.

Before NEWMAN, Chief Judge, and KELLY and HARRIS, Associate Judges.

KELLY, Associate Judge:

We here review, under D.C.Code 1973, § 11–722, a final order of the Department of Human Resources [Department] denying the application of the petitioner, Martha Mae Rorie, for emergency assistance funds to purchase necessary apartment furnishings. The Department's final order was issued after a hearing pursuant to D.C.Code 1973, § 3–214, and was based upon the provisions of its "Manual of Policies and Procedures."

Petitioner argues that the manual policies upon which the Department relied in denying her application were invalid as they were not promulgated in accordance with the District of Columbia Administrative Procedure Act [DCAPA], D.C.Code 1978 Supp., § 1–1501 et seq. Counsel for the Department conceded the invalid promulgation at oral argument. Petitioner also contends that the Department's order is an irrational denial of equal protection of the laws and a denial of due process, but in light of our disposition of this case, we need not reach these constitutional issues. Cf. Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Additionally, petitioner's claim that the Department's emergency assistance regulations must comply with federal eligibility standards falls in the face of the Supreme Court's recent decision in Quern v. Mandley, 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978). However, for the reasons discussed below, we nevertheless conclude that federal eligibility standards must be considered in light of the invalidity of the policies upon which the Department relied.

Part I of this opinion sets out the essentially undisputed facts from which this case arose. Part II outlines the federal welfare system, of which the District of Columbia's emergency assistance program is a part, and explains the discretion which that system leaves to the District and to the States. Part III discusses the District's failure to properly exercise its discretion in this case. And finally, Part IV explains why, in the absence of a valid alteration by the District, the eligibility standards for emergency assistance set out in 42 U.S.C. § 606(e) (1976), and 45 C.F.R. § 233.120(b) (1978), were the standards against which petitioner's request for aid should have been measured.

I

Petitioner is a District of Columbia resident and the mother of four children. She lived in North Carolina with her husband, but when they separated on hostile terms, her husband refused to let her take any of the family furniture. As a consequence, petitioner and her children were forced to move in temporarily with a sister in Washington, D.C. She then found employment, and on March 22, 1977, applied for Aid to Families with Dependent Children [AFDC] as a supplement to her earnings.[1] On April 22, 1977, petitioner sought emergency assistance funds to help her get established in a new apartment. The Department provided money to pay a security deposit on the apartment but refused to provide funds for needed beds and other furniture. The denial was based on a departmental policy permitting such payments only when necessary to permit a child living outside the home to return to the family or to replace furniture lost in a natural catastrophe. On April 26, 1977, petitioner made a timely request for an administrative hearing on her application.

After a hearing on August 16, 1977, an initial decision was issued on September 13, 1977. The hearing officer found therein that the original caseworker had failed to evaluate petitioner's financial circumstances to determine whether an emergency did exist. The hearing officer did so, finding that there was indeed a crisis and that petitioner's children were sleeping on the

---

1. While the Department did not begin making AFDC payments to petitioner until June 3, 1977, its determination that she was due AFDC benefits retroactive to April 1, 1977, establishes that she qualified as an AFDC recipient at the time she sought emergency assistance.

floor.[2] He also found, however, that emergency assistance funds for furniture could not be granted even if a family crisis did exist since, because petitioner and her children were living together rather than apart, they did not qualify for funds meant only to reunite families. Reliance for this holding was placed upon a Department policy manual provision which stated:

> Emergency Assistance funds may be used to purchase basic furniture only for the purpose of reuniting children with their families, expediting relocation of Family Shelter recipients, or replacir g Public Assistance recipients' furniture which has been destroyed in a ·natural disaster. [D.H.R. Manual of Policies and Procedures, Instructions for Payments Assistance and Social Rehabilitation Assistance Workers, Emergency Assistance Service, Ch. VII–6–B(2)(i) (1975).]

Petitioner filed written exceptions to the initial decision, arguing that the manual provision relied upon by the hearing officer was inconsistent with the Federal Social Security Act, and further, that it was not properly promulgated under the DCAPA. The Department responded with a final order which affirmed the initial decision, adopted the hearing officer's findings of fact and conclusions of law, and summarily concluded that petitioner's exceptions "do not warrant further consideration." Petitioner then filed in this court a timely petition for review.

## II

The relevant aspects of the federal welfare system were recently summarized by the Supreme Court in *Quern v. Mandley,* *supra* at 728–29, 98 S.Ct. at 2071:

> Title IV–A of the Social Security Act establishes several different public aid programs under the general rubric of "Grants to States for Aid and Services to Needy Families with Children." In order to receive federal funds under any of the Title IV–A programs a State must adopt a "state plan for aid and services to needy families with children" that is approved by the United States Department of Health, Education, and Welfare (HEW) as meeting the requirements set forth in § 402 of the Act.

> . AFDC is the core of the Title IV–A system. As the Court observed in one of its earliest forays into Title IV, AFDC is a categorical aid program, and "the category singled out for welfare assistance . . . is the 'dependent child,' who is defined in § 406 of the Act . . . as an age-qualified 'needy child . . . who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with' any one of several listed relatives." *King v. Smith,* 392 U.S. 309, 313, 88 S.Ct. 2128, 2131, 20 L.Ed.2d 1118. A State's expenditures for AFDC, under an approved § 402 state plan, are reimbursed by the Federal Government according to the formula set forth in § 403(a)(1).

> The federal EA program was added to Title IV as part of the omnibus Social Security Amendments of 1967. Pub.L. 90–248, § 206, 81 Stat. 893.[3] It was

**2.** At oral argument, in response to a question about whether facts might have rendered this appeal moot, counsel stated that petitioner and her four children are currently sleeping in two beds and still have no other furniture.

**3.** EA stands for Emergency Assistance. Section 406(e) of the Social Security Amendments Act, as set forth in 42 U.S.C. § 606(e) (1976), provides in pertinent part:

> (1) The term "emergency assistance to needy families with children" means any of the following, furnished for a period not in excess of 30 days in any 12–month period, in the case of a needy child under the age of 21 who is (or, within such period as may be

specified by the Secretary, has been) living with any of the relatives specified in subsection (a)(1) of this section in a place of residence maintained by one or more of such relatives as his or their own home, but only where such child is without available resources, the payments, care, or services involved are necessary to avoid destitution of such child or to provide living arrangements in a home for such child, and such destitution or need for living arrangements did not arise because such child or relative refused without good cause to accept employment or training for employment—

> (A) money payments, payments in kind, or such other payments as the State agency

described in the Senate Finance Committee report as "a new program optional with the States [to] authorize dollar-for-dollar Federal matching to provide temporary assistance to meet the great variety of situations faced by needy children in families with emergencies." S.Rep.No. 744, 90th Cong., 1st Sess., p. 4 (1967). U.S.Code Cong. & Admin.News 1967, pp. 2834, 2838. To participate in the program a State must include a provision for EA in its § 402 state plan, and funding at a flat rate of 50% of program expenses is authorized by § 403(a)(5).

Unlike AFDC, eligibility for EA is not limited to "dependent children." Instead, the term "emergency assistance to needy families with children" is broadly defined in § 406(e) to include money payments and other kinds of aid provided on a temporary basis "to avoid destitution . . . or to provide living arrangements for" a "needy child under the age of 21 who is . . . without available resources." 42 U.S.C. § 606(e)(1). Thus under the EA statute, federal matching funds are available for emergency aid to intact families with children if threatened with destitution, regardless of the cause of their need.

Regulations issued by the Secretary of Health, Education, and Welfare elaborate on the eligibility criteria for receipt of federal financial assistance under § 606(e):

(b) *Federal financial participation.* Beginning with the effective date of approval of the amendment to the State plan for AFDC which provides for emergency assistance to needy families with

children pursuant to section 406(e) of the Act:

(1) Federal financial participation is available for emergency assistance to or on behalf of a needy child under the age of 21 and any other member of the household in which he is living if—

(i) Such child is (or, within 6 months prior to the month in which such assistance is requested, has been) living with any of the relatives specified in section 406(a)(1) of the Act [4] in a place of residence maintained by one or more of such relatives as his or their own home,

(ii) Such child is without resources immediately accessible to meet his needs,

(iii) The emergency assistance is necessary to avoid destitution of such child or to provide living arrangements for him in a home, and

(iv) His destitution or need for living arrangements did not arise because he or such relative refused without good cause to accept employment or training for employment. [45 C.F.R. § 233.120(b) (1978).]

The District of Columbia chose to participate in this emergency assistance program.[5] The federal "offer to the States of a 50 per-cent participation in emergency assistance payments"[6] was accepted in an Order of the Commissioner[7] directing that

*Section 1.* The Department of Public Welfare,[8] in administering the Crisis Assistance and Service Program, shall claim Federal financial participation *to the extent allowable by law* for assistance and services to needy families with children,

may specify with respect to, or medical care or any other type of remedial care recognized under State law on behalf of, such child or any other member of the household in which he is living, and
(B) such services as may be specified by the Secretary;
but only with respect to a State whose State plan approved under section 602 of this title includes provision for such assistance.

4. As the mother of her children, Ms. Rorie is one such relative. 42 U.S.C. § 606(a)(1) (1976).

5. For the purposes of the Social Security Act, the District of Columbia is considered the

equivalent of a state. 42 U.S.C. § 1301(a)(1) (1976), 45 C.F.R. § 201.1(g) (1978).

6. S.Rep.No.744, 90th Cong., 1st Sess., *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 2834, 3003.

7. D.C.Code 1973, § 3–209, as effective at that time, authorized the Commissioner (now the Mayor) to "grant emergency public assistance. . . ."

8. Now the Department of Human Resources. *See* O.C. No. 69–96, Mar. 7, 1969, as amended by O.C. No. 70–86, Mar. 6, 1970.

provided the family has not received assistance from any emergency program for more than 30 consecutive days within the last twelve months and provided the crisis did not arise because the child, parent or other relative refused without good cause to accept employment. (Section 406(e)(1) of the Social Security Act). [O.C. No. 68–722a, Nov. 15, 1968 (emphasis added).] [9]

This program has been carried forward under this order and under O.C. No. 69–263, May 29, 1969,[10] within the framework established by Congress in the District of Columbia Public Assistance Act of 1962, as since amended. *See* D.C.Code 1978 Supp., § 3–201 *et seq.* In administering its programs, the Department apparently published internal guidelines for its staff to use in evaluating applications for assistance. *See Robinson v. Washington,* 302 F.Supp. 842, 844 (D.D.C.1968); *Stewart v. Washington,* C.A. No. 432–68 (D.D.C., June 17, 1968). The manual provision under which petitioner's application was denied was such a guideline. However, the Department has attempted to promulgate these policies in accordance with the DCAPA only quite recently. The regulations for emergency assistance, relevant here, were published for comment in the D.C. Register only on April 28, 1978, more than one year after Ms. Rorie's application was denied.

Since the Department's guidelines for emergency assistance eligibility are more restrictive than the federal standards set out above, we have a question facially similar to that in *Quern v. Mandley, supra,* where the Supreme Court considered an Illinois decision to "adopt an EA program of much narrower scope [than the federal standards]." *Id.* at 729, 98 S.Ct. at 2071–2072. In *Quern,* the Court, dealing with the question of whether "§ 406(e) imposes mandatory eligibility standards on States participating in the EA program," *id.* at 739, 98 S.Ct. at 2076–2077, held that the states

could receive federal aid for the eligible portions of their emergency assistance programs even if they chose to operate programs that did not serve *all* those eligible under the federal standards.

In its decision, the Court reaffirmed its long-standing holding that, in regard to most AFDC programs, the states have discretion to set the levels of benefits and the standards of need, *Jefferson v. Hackney,* 406 U.S. 535, 541, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Dandridge v. Williams,* 397 U.S. 471, 478, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Rosado v. Wyman,* 397 U.S. 397, 408, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *King v. Smith,* 392 U.S. 309, 318, 334, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); while federal standards are the measure of eligibility for assistance, *Carleson v. Remillard,* 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972); *Townsend v. Swank,* 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); *Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970). It then held, however, that Congress by its use of the specific term "needy child" in its § 406(e) discussion of emergency assistance, had indicated an intent that the mandatory eligibility standards that flow from its use of the phrase "dependent child" throughout the rest of the Social Security Act should not apply in the special case of emergency assistance. *Quern v. Mandley, supra* at 742–43, 98 S.Ct. 2068. It also found that there were several policy rationales that supported its reading of congressional intent. Focusing on the potential breadth of the federal eligibility standards and on Congress' intent to "encourage the states to move quickly in family crises, supplying the family promptly with appropriate services [to] preclude the necessity of the family having to go on assistance on a permanent basis," 113 Cong. Rec. 23054 (1967) (remarks of Cong.Mills), the Court held that the intent of Congress in passing § 406(e) was not to impose mandatory eligibility standards on states that

---

9. The limitations apparent in this order actually merely paraphrase the text of § 406(e)(1) of the federal Social Security Act, 42 U.S.C. § 606(e)(1) (1976).

10. A one sentence order authorizing establishment of an Emergency Assistance Service program.

elect to participate in an EA program. Although the Court expressly noted that it did not reach the constitutional and state law claims raised in *Quern, id.* at 747 n.22, 98 S.Ct. 2068, it now seems that each state and the District can exercise its own discretion in deciding whether to participate in the 406(e) program to the full extent of that law.

### III

In exercising its discretion in regard to emergency assistance, the District of Columbia has produced conflicting signals. The Orders of the Commissioner have been quite broad and general while the regulations of the Department have been quite specific. Counsel for petitioner have challenged the validity of the Department's manual provisions on two grounds; arguing that they were not promulgated in accordance with the requirements of the DCAPA and that the City Council, rather than the Department, has exclusive authority to issue such regulations. Because we decide this case upon the basis of the first of these arguments, it is not necessary that we consider the second.

The Department, however, has alleged in its brief and at argument that it is now repromulgating the necessary regulations through procedures which accord with the provisions of the DCAPA. Thus, in the interests of judicial economy, it is appropriate to note that the Task Force on the Reorganization of the Department of Human Resources has recently concluded that, "the power to issue rules and regulations for DHR rests in the City Council. Although the Council could delegate this responsibility to DHR, it has never done so." *A Report to the Council of the District of Columbia on the Operation of the Department of Human Resources* (January 1978) at 108. This court has already noted, in dictum, its "grave doubt" that the Council has ever made the delegations of authority

necessary for the Department's issuance of valid regulations on welfare issues. *Junghans v. Department of Human Resources,* D.C.App., 289 A.2d 17, 25 (1972); *accord, Robinson v. Washington, supra; Stewart v. Washington, supra; see also Howard v. Department of Public Welfare,* D.C.App., 272 A.2d 676, 678 n.7 (1971). In this connection, we note the recommendations of the Task Force on the issue. It suggests that either the Department should inform all staff "that the Handbook and Manual do not and cannot have the force of law; they are merely interpretative of the law (federal and City Council statutes and regulations) and are invalid insofar as they conflict with that law," or that the "second solution would be for the Council to delegate rulemaking power to DHR." *A Report to the Council, supra* at 109.

Whatever uncertainty there may be as to the general rulemaking authority of the Department, it is clear that the manual provision at issue here was not issued in compliance with the DCAPA. Such regulations are clearly "rules" within the meaning of the DCAPA, D.C.Code 1978 Supp., § 1–1502(6). *See Junghans v. Department of Human Resources, supra* at 23. *Compare Wolston v. District of Columbia Department of Human Resources,* D.C.App., 291 A.2d 85 (1972). The hearing officer who decided petitioner's case treated it as a binding rule and the Department directly affirmed his decision. Yet at neither time had the manual ever been published in the D.C. Register as required by D.C.Code 1978 Supp., § 1–1505(a). Nor was the provision ever submitted to the City Council for approval. *See Junghans v. Department of Human Resources, supra* at 23. Thus, the regulations had not become effective when petitioner's application was considered. D.C.Code 1978 Supp., § 1–1506(c).[11]

11. D.C.Code 1978 Supp., § 1–1506(c) provides:

Except in the case of emergency rules, each rule adopted after the effective date of this subchapter by the Mayor or by any agency, shall be filed in the office of the Mayor. No such rule shall become effective until af-

ter its publication in the District of Columbia Register, nor shall such rule become effective if it is required by law, other than this subchapter, to be otherwise published, until such rule is also published as required in such law.

In essence we have here a case of a request for assistance denied on the basis of an invalid regulation, and the Department's present argument that the post hoc publication of these regulations in the D.C. Register should cause them to acquire validity is patently without merit.

The Department's reliance on *Junghans, supra,* for the assertion that proper promulgation is the only remedy for originally invalid regulations is misplaced in this case. As counsel for the Department admitted at oral argument, the equities were quite different in the *Junghans* case. In that case, the court faced a situation where the District was attempting "commendably, but belatedly, to put the District's public assistance program in compliance with the Social Security Act and thereby avoid losing federal funds . . . ." *Id.* at 26 (footnotes omitted). In order to avoid the disastrous result of voiding the District's entire welfare system this court gave the Council and the Department an appropriate remedy by staying the execution of its order until the Council and the Commissioner had an "opportunity to issue, after proper notice and upon appropriate publication, rules establishing a public assistance formula for the District of Columbia relating back to August 1, 1970." *Id.* at 26.

No such extraordinary equitable necessities are present in this case. Petitioner's application must then, on remand, be evaluated as though the invalid regulation had not existed.[12]

## IV

■ Petitioner's counsel have argued that her application should have been considered under the terms of the federal eligibility standards set out in 42 U.S.C. § 606(e) (1976), and 45 C.F.R. § 233.120(b) (1978). Their argument that this result should follow from a congressional intent that those eligibility standards should be mandatory is the same argument that was dismissed when the Supreme Court overturned the

Seventh Circuit's opinion in *Quern v. Mandley, supra.* That decision now allows the District to choose how broadly it intends to take advantage of the federal assistance thus offered. In the manual provision that we have found invalid, the Department indicated a desire to choose quite narrowly.

The Order of the Commissioner initiating this program indicated, however, quite a different desire. It directed that the Department "shall claim Federal financial participation to the extent allowable by law . . . ." O.C. No. 68–722a, *supra.* The order then repeated the limitations contained in 42 U.S.C. § 606(e)(1) (1976), and specifically cited § 406(e)(1) of the Social Security Act. By the standards of this order, applications to the District's emergency assistance program are to be considered under the terms set out in the federal statute. As we noted in note 7, *supra,* the Commissioner could issue this order under the authority of D.C.Code 1973, § 3–209, and since it created no change in existing law, there was no need to comply with the procedural requirements which preceded the effective date of the DCAPA. Until the District validly adopts a more restrictive interpretation of the eligibility requirements for emergency assistance, the federal eligibility standards are those by which applications for emergency assistance are to be measured.

## CONCLUSION

While *Quern v. Mandley, supra,* indicates that the District may adopt emergency assistance eligibility requirements more restrictive than those set out in the federal statute and regulations, the District had never validly done so at the time that petitioner applied for assistance. The Order of the Commissioner which established that program ordered the Department to claim federal assistance to the full extent of the law and specifically cited the federal standards. Thus, petitioner had the right to have her request for assistance considered in light of the applicable federal standards.

---

12. D.C.Code 1978 Supp., § 1–1510 provides, in part, that this court

 shall have power to affirm, modify, or set aside the order or decision complained of, in

whole or in part, and, if need be, to remand the case for further proceedings, as justice may require. . . .

Accordingly, the decision of the Department of Human Resources is reversed and the case is remanded for reconsideration in light of this opinion.

*So ordered.*