Pamela Susan ANDREWS, Petitioner,

v.

DISTRICT OF COLUMBIA POLICE AND FIREFIGHTERS RETIRE-MENT AND RELIEF BOARD, Respondent.

No. 08–AA–1008.

District of Columbia Court of Appeals.

Argued Feb. 3, 2010.

Decided March 18, 2010.

Robert E. Deso, Washington, DC, for petitioner.

Holly M. Johnson, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Before FISHER and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

THOMPSON, Associate Judge:

Petitioner Pamela Andrews asks us to (1) overturn a July 31, 2008 order of the Police & Firefighters Retirement & Relief Board (the "Board") that denied her claim for a survivor's annuity on the ground that the claim was untimely filed, and (2) order

the Board to pay her survivor's benefits. We agree that the Board's ruling that petitioner's application was time-barred cannot stand, and we therefore reverse the Board's order. We conclude, however, that we must remand this matter to the Board to determine whether petitioner is otherwise eligible to receive a survivor's annuity.

## I.

Petitioner is the daughter of Elmer Andrews, who retired as a member of the Metropolitan Police Department ("MPD") on March 1, 1971, and died on August 28, 1983. D.C.Code § 5–716(c) (2001) provides in pertinent part that "[e]ach surviving child ... of any former member who dies after retirement ... shall be entitled to an annuity ...[,]" and D.C.Code § 5–701(5)(A)(iii) (2001) defines "child" to include an "unmarried child regardless of age who, because of physical or mental disability incurred before the age of 18, is incapable of self-support." Although the record does not contain a copy of the District of Columbia Police Officers' and Firefighters' Retirement Summary Plan as may have been issued to Elmer Andrews, there appears to be no dispute that such plan provided, as did the 1985 Summary Plan that is in the record, that if a member died, his "survivors or beneficiary must ... file with the Retirement and Relief Board to receive ... the automatic survivor's benefit" and submit evidence of eligibility.

Petitioner, who asserts her eligibility for survivor benefits on the basis of her claimed "low mental capacity" documented prior to age eighteen, first filed a claim for benefits on March 14, 2001. On July 5, 2001, the Board issued an order denying the claim on the ground that it was filed outside the "three ... year statute of limitations ..." established by D.C.Code § 12–301(8) (2001) (providing that actions "for which a limitation is not otherwise specially prescribed" may not be brought after the expiration of three years).[1]

On June 6, 2008, petitioner's then-eighty-nine-year-old step-mother submitted a letter to the Board, again applying for a survivor annuity benefit for petitioner and stating that "it is clear that the denial of benefits in 2001 was in error." The Board once again denied the application, stating that "[a]t the time of this current request for a survivor annuity it has been over 20 years since the statute of limitations for such requests has expired." The Board did not cite its earlier denial of petitioner's 2001 claim as a reason for denying the 2008 claim.

Petitioner timely appealed the Board's 2008 order. In her initial brief on appeal, she argued, inter alia, that the Board erred in concluding that the residual statute of limitations, D.C.Code § 12–301(8), barred her claim since it applies only to "actions," not to claims for benefits to which eligible survivors are "automatically entitled."[2] The District of Columbia subsequently filed a motion and then a brief urging us to remand, conceding that section 12–301(8) is inapplicable, and arguing that a remand is appropriate so that the

---

1. The Board determined that petitioner "had until August 28, 1986, to file a timely application for a survivor annuity[,]" but filed "nearly fourteen ... years and seven ... months too late."

2. See *Jackson v. District of Columbia Police & Firefighters Ret. & Relief Bd.*, 717 A.2d 904,

907 (D.C.1998) (noting that the governing statute "plainly indicates that upon the happening of a contingency, the death of a former member after retirement, the surviving [beneficiary] shall automatically be entitled to annuity benefits directly from the District of Columbia").

Board may consider in the first instance (1) whether to apply some other deadline, and, if the Board determines that petitioner's claim is not time-barred, (2) whether petitioner qualifies to receive benefits. Petitioner opposes a remand, arguing that the record is sufficient for this court to determine that she was disabled by age eighteen and that her disability continues, and that the "remedial ... purposes" of the District of Columbia Police and Firefighters Retirement and Disability Act ("the Act")[3] and her personal circumstances-she asserts that she is at risk of institutionalization because she depends on her aged step-mother for care and support-warrant an expeditious resolution of this matter.[4]

## II.

### A.

■ We begin our analysis by addressing briefly an issue that we raised with the parties at oral argument: whether petitioner's claim for relief in this court is barred by her failure to submit a timely request for reconsideration[5] or timely appeal of the Board's 2001 order, in which the Board denied the same claim that petitioner reasserted in 2008. We conclude that while the Board might have cited its non-appealed 2001 order as a basis for denying petitioner's 2008 claim,[6] it has waived any claim of administrative *res judicata* by not invoking it in the 2008 order.[7] *See Poulin v. Bowen*, 817 F.2d 865, 868–69 (D.C.Cir.1987) (agency that waived application of "administrative res judicata" may not assert that doctrine on appeal as an alternate basis for upholding its decision); *Ngom v. District of Columbia Dep't of Employment Servs.*, 913 A.2d 1266, 1269 (D.C.2006) (citing *Poulin* for the proposition that "*res judicata* must be raised before the reviewing court can apply the doctrine"); *see also USPS v. NLRB*, 969 F.2d 1064, 1069 (D.C.Cir.1992) ("[C]ourts do not force preclusion pleas on parties who choose not to make them. . . ."). On that basis, and because there is no issue of our own jurisdiction (we are asked to review a 2008 final order, as to which peti-

---

**3.** *See District of Columbia v. Tarlosky,* 675 A.2d 77, 80 (D.C.1996) ("We view the Act as remedial legislation which is to be interpreted liberally to achieve its purposes.").

**4.** Petitioner urges us to follow the approach articulated by the United States Court of Appeals for the District of Columbia Circuit in *LaSalle Extension Univ. v. FTC:* "Notwithstanding the importance of having the [factfinder] express its conclusions with care and in adequate detail ... we will not remand the case for more specific findings if doing so will consume precious time and judicial resources without serving any purpose." 627 F.2d 481, 485 (D.C.Cir.1980) (per curiam).

**5.** *See* 7 DCMR § 2525.1 (1986) ("A petition for reconsideration, rehearing or reargument may be filed by an applicant within fifteen (15) days after the receipt of the Retirement Board's decision.").

**6.** We express no view as to whether *res judicata* actually would have barred petitioner's

second claim. In particular, we do not address petitioner's argument that, before denying her first claim, the Board failed to meet its responsibility to assist her in developing the record (e.g., about her diminished mental capacity) to assure a fair resolution of her claim, *see* 7 DCMR § 2503.3 ("The Board shall, in any case in which an applicant represents himself or herself, or is represented by a non-legal representative, take such action as may reasonably be necessary to insure that all information material to the case be developed to the fullest extent possible, commensurate with the Board's function of sitting as an impartial body."); and that her 2008 claim therefore is not barred by the 2001 decision that the Board made on an (allegedly) underdeveloped record.

**7.** The Board has not suggested otherwise; it states in a footnote to its brief that it is not pursuing a *res judicata* argument on appeal.

tioner filed a timely petition for review), we proceed to the merits.

## B.

The parties agree that neither the Act, D.C.Code §§ 5–701 to –724, nor the implementing regulations contain any provision establishing a deadline by which a survivor must file any claim for survivor's benefits (a "claim-filing deadline"). The legislative history of the Act suggests an angle for arguing that a claim-filing deadline would, or would not, be consistent with the purposes of the statute and the statutory scheme,[8] but no definitive guidance can be drawn either way.

The District continues to urge us to remand to permit the Board, exercising its responsibility and authority to administer the Act, to determine whether a claim-filing limit is appropriate. If the immediate issue were whether a claim-filing deadline is permissible as a prospective rule of general application, we would agree that the Board should address the issue in the first instance, drawing upon its expertise about what is necessary for the effective administration of the benefit program that the Act establishes.[9] But the question before us is more focused: assuming *arguendo* that the Board may adopt a claim-filing deadline, may it do so in the course of

**8.** As discussed at oral argument, this court has recognized repeatedly that "[w]hen the Act was originally enacted in 1957, its stated purpose [was] to provide benefits comparable to those given under the federal Civil Service Retirement Act Amendments of 1956." *Ridge v. Police & Firefighters Ret. & Relief Bd.*, 511 A.2d 418, 427 (D.C.1986) (citing S.Rep. No. 699, 85th Cong., 1st Sess. 2 (1957)); *see also, e.g., Martin v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 532 A.2d 102, 117 n. 6 (D.C.1987) (Rogers, J., dissenting) (same); *Coakley v. Police & Firemen's Ret. & Relief Bd.*, 370 A.2d 1345, 1349 (D.C.1977) (suggesting that there may be "merit to th[e] manner of argument" of analogizing to Congress's intent in the Civil Service Retirement Act). Notably, the Civil Service Retirement Act provides that "[n]o payment shall be made ... unless an application for benefits based on the service of an employee or Member is received ... before the one hundred and fifteenth anniversary of his birth" and "no benefit based on his service shall be paid ... unless an application therefor is received ... within 30 years after the death or other event which gives rise to title to the benefit." 5 U.S.C. § 8345(i)(1)(2) (2006). At least arguably, the inclusion of these deadlines in the Civil Service Act, but not in the Police & Firefighter's Act that was enacted to afford similar benefits, may be read to mean that the legislature either did or did not intend that claims for Police & Firefighter's survivor benefits would be subject to a similar claim-filing deadline.

We also note that the Act provides, in D.C.Code § 5–723(c), that a beneficiary may waive her right to survivor's benefits but may thereafter revoke the waiver and begin to receive benefits on a prospective basis. This provision appears to contemplate that the Board may be required to pay benefits even if the potential obligation to pay could not have been projected with any certainty during the period immediately following a member's death. However, the provision need not necessarily be read to require tolerance of the delayed filing of an *initial* claim for benefits.

**9.** Although we need not (and do not) decide definitively whether the Board may adopt a general rule establishing a claim-filing deadline, we recognize that the Board, as the Mayor's designee, may "promulgate such rules and regulations ... necessary to carry out the Mayor's responsibilities" under the Act. D.C.Code § 5–724(b) (2001); *cf. Withey v. Perales*, 920 F.2d 156 (2d Cir.1990) (upholding state-promulgated regulation that established a sixty-day deadline for recipients to appeal benefit actions under the federal AFDC program, even though neither the text nor the legislative history of the governing federal statute specifically authorized a deadline, since the state could reasonably determine that unexpected claims could overburden the state's ability to assist the current poor, and that, without a deadline, the state would have the administrative burden of keeping the files of all recipients "perpetually available").

resolving petitioner's claim and apply the deadline to deny her application for benefits? This is a question whose resolution turns on application of the District of Columbia Administrative Procedure Act ("the DCAPA")[10] as our court has construed it (and on the interpretation by federal courts of the analogous federal Administrative Procedure Act[11]). That task does not fall within the Board's special expertise, but instead is one that this court may address in the first instance. *See Mergentime Perini v. District of Columbia Dep't of Employment Servs.*, 810 A.2d 901, 906 (D.C.2002).

■ The DCAPA mandates that:

The Mayor and each independent agency shall, prior to the adoption of any rule or the amendment or repeal thereof, publish in the District of Columbia Register (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law) notice of the intended action so as to afford interested persons opportunity to submit data and views either orally or in writing, as may be specified in such notice. The notice shall also contain a citation to the legal authority under which the rule is being proposed. The publication or service

required by this subsection of any notice shall be made not less than 30 days prior to the effective date of the proposed adoption, amendment, or repeal, as the case may be, except as otherwise provided by the Mayor or the agency upon good cause found and published with the notice.

D.C.Code § 2–505(a) (2001).[12] It further provides that:

Except in the case of emergency rules or acts, no rule or document of general applicability and legal effect adopted or enacted on or after March 6, 1979, shall become effective until after its publication in the District of Columbia Register, nor shall such rule or document of general applicability and legal effect become effective if it is required by law, other than subchapter I of this chapter or this subchapter, to be otherwise published, until such rule or document of general applicability and legal effect is also published as required by such law.

D.C.Code § 2–558(b) (2001). Thus, the DCAPA establishes that a rule of general applicability may not be given effect unless it has first been adopted following notice-and-comment rulemaking and publication in the D.C. Register. *See, e.g., Webb v. District of Columbia Dep't of Human*

---

10. The DCAPA, D.C.Code §§ 2–501 to –562, "supplement[s] all other provisions of law establishing procedures to be observed by the Mayor and agencies of the District government in the application of laws administered by them, [and] ... shall supersede any such law and procedure to the extent of any conflict therewith." D.C.Code § 2–501 (2001).

11. We look to case law interpreting the federal APA for guidance since "the DCAPA requirements as to notice and comment are closely analogous to the requirements of the Federal Administrative Procedure Act[.]" *Citizens Ass'n of Georgetown v. Zoning Comm'n of D.C.*, 392 A.2d 1027, 1038 (D.C.1978) (en banc); *see also District of Columbia v. Craig*, 930 A.2d 946, 967-68 (D.C.2007); *Timus v.*

*District of Columbia Dep't of Human Rights*, 633 A.2d 751, 780 n. 2 (D.C.1993) (Steadman, J., dissenting) ("The legislative history of the District of Columbia Administrative Procedure Act indicates that although it is somewhat different from the federal Administrative Procedure Act[,] ... it is generally to be interpreted akin to the federal APA.").

12. A "rule" is "the whole or any part of any Mayor's or agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of the Mayor or of any agency." D.C.Code § 2–502(6)(A).

*Servs.,* 618 A.2d 148, 151 (D.C.1992) (per curiam); *Rorie v. District of Columbia Dep't of Human Res.,* 403 A.2d 1148, 1149 (D.C.1979).

The Board draws our attention to cases in which this court and others have recognized that agencies may engage in adjudicative rulemaking—i.e., may adopt a rule of general applicability through adjudication and, at least in some cases, apply the new rule in resolving the case in which the rule is first announced.[13] However, a careful study of the cases in which courts have upheld such retroactive application of adjudicative rules shows that the rules in question were "interpretive" (or clarifying) rules rather than "substantive" (or "legislative") rules. *Compare, e.g., Lee v. District of Columbia Dep't of Employment Servs.,* 509 A.2d 100, 101, 103 (D.C.1986) (upholding agency rule, adopted through adjudication, that was a permissible interpretation of D.C.Code § 36–303(a)(1)), *Washington Hosp. Ctr. v. District of Columbia Dep't of Employment Servs.,* 743 A.2d 1208, 1212 (D.C.1999) (upholding agency rule, adopted through adjudication, that "represents a procedural clarification that is consistent with the statutory thirty day filing requirement set forth in [D.C.Code] § 36–322(b)(2)"), *and Keefe Co. v. District of Columbia Bd. of Zoning Adjustment,* 409 A.2d 624, 625 n. 2 (D.C.1979) (upholding Board of Zoning Adjustment determination, imposed without compliance with DCAPA procedural requirements, where the BZA merely interpreted the statutory phrase "similar professional person"), *with Webb,* 618 A.2d at 151 (holding that the Department's policies governing eligibility for homemaker services under the federal Social Services Block Grant program could not be used to deny benefits to the petitioner because the federal statute was "silent on eligibility standards" and the Department's policies were rules subject to the rulemaking requirements of, but had not been promulgated in accordance with, the DCAPA), *and Rorie,* 403 A.2d at 1153, 1154, 1155 (reversing agency's decision denying application for Emergency Assistance program funds to purchase furniture, even though the Department had discretion to set its own eligibility standards under the federal program, because the decision was based on an internal departmental policy—that permitted such payments only when necessary to permit a child living outside the home to return to the family or to replace furniture lost in a natural catastrophe—that had not been published in the D.C. Register in compliance with the DCAPA). We pause to explain the distinction between interpretive and substantive or legislative rules, which is important to our analysis.

■ The DCAPA definition of a "rule" is "certainly broad" and, on its face, could be read to require notice and comment and prior publication for *any* agency policy designed to implement a governing law. *District of Columbia v. North Wash. Neighbors, Inc.,* 367 A.2d 143, 147 (D.C. 1976). We have held, however, that when an agency rule "merely describes the effect of an existing [statute,] rule or regulation," it does not fall within the DCAPA definition of "rule" and "the procedural formalities of the APA are unnecessary." *Id.* (emphasis omitted). Such a rule is referred to as an "interpretive" (or "interpretative") rule. *See, e.g., Rosetti v. Shalala,* 12 F.3d 1216, 1222 n. 15 (3d Cir. 1993) ("Interpretive rules ... merely clarify or explain existing law or regulations.")

---

**13.** Whether an adjudicative rule may be applied retroactively (i.e., in the case in which it is announced) depends upon several factors.

*See Reichley v. District of Columbia Dep't of Employment Servs.,* 531 A.2d 244, 251–54 (D.C.1987).

(citation and internal quotation marks omitted); *National Family Planning & Reprod. Health Ass'n v. Sullivan,* 979 F.2d 227, 236 (D.C.Cir.1992) ("A rule that clarifies a statutory term is the classic example of an interpretative rule."). An interpretive rule "serves an advisory function explaining the meaning given by the agency to a particular word or phrase in a statute or rule it administers," *Batterton v. Marshall,* 648 F.2d 694, 705 (D.C.Cir.1980), or "simply explain[s] something the statute already require[s]." *Nat'l Family Planning,* 979 F.2d at 237 (citation and internal quotation marks omitted). As the D.C. Circuit has explained, to be an interpretive rule, a "rule must be interpreting something. It must derive a proposition from an existing document whose meaning compels or logically justifies the proposition. The substance of the derived proposition must flow fairly from the substance of the existing document." *Central Tex. Tel. Coop., Inc. v. FCC,* 402 F.3d 205, 212 (D.C.Cir.2005) (quoting Robert A. Anthony, *"Interpretive" Rules, "Legislative" Rules, and "Spurious" Rules: Lifting the Smog,* 8 ADMIN. L.REV. 1, 6 n. 21 (1994)) (internal quotation marks omitted). "If, despite an agency's claim, a rule cannot fairly be viewed as interpreting—even incorrectly—a statute or a regulation, the rule is not an interpretive rule exempt from notice-and-comment rulemaking." *Id.*[14]

▮ By contrast, when an agency exercises its authority "to supplement [a statute], not simply to construe it," *Cham-*

*ber of Commerce v. OSHA,* 636 F.2d 464, 469 (D.C.Cir.1980), it makes new law and thereby engages in "substantive" or "legislative" rulemaking. Legislative or substantive rules do more than simply clarify or explain a statutory or regulatory term; they are not mere interpretations of a statute's or regulation's meaning, but are "self imposed controls over the manner and circumstances in which the agency will exercise its plenary power." *Pickus v. United States Bd. of Parole,* 507 F.2d 1107, 1113 (D.C.Cir.1974).

▮ When an agency announces a new statutory interpretation—and thus engages in interpretive rulemaking—it may do so through adjudication, and (in many cases) may give retroactive effect to the interpretation in the case in which the new interpretation is announced, because the agency is not really effecting a change in the law. *See N. Wash. Neighbors,* 367 A.2d at 147 (explaining that the rulemaking envisioned in the DCAPA is "quasi-legislative," and that DCAPA requirements do not apply "where the government agency performs no legislative function but only describes or refers to the regulation as it is written"). But when an agency supplements a statute, such as by adopting new requirements or limits or imposing new obligations, the rule is invalid unless it had been adopted through notice-and-comment rulemaking and published in compliance with the DCAPA. *See id.* (explaining that legislative rules are "clearly within the ambit of the rulemaking provisions of the DCAPA").[15]

---

**14.** *See also id.* at 210 ("By a 'substantive rule'—or as we call it, a 'legislative rule,' a term not used in the APA[,] petitioners mean a rule that may be promulgated only after compliance with the rulemaking requirements of [the federal] APA. . . . By 'interpretative rule,' a term the APA does use, the Commission means a rule that § 553(b)(3)(A) exempts from those requirements.").

**15.** *Compare NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,* 416 U.S. 267, 290, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (holding that the NLRB, which had not followed rulemaking procedures, was not precluded from giving effect to adjudicative ruling that buyers are not "managerial employees" and thus were subject to the protections of the National Labor Relations Act), *with NLRB v. Wyman-*

■ As we have previously observed, "[t]here are no rigid formulas for determining when an official action results in a 'rule' for purposes of the DCAPA[,]" and, sometimes, "the line between an adjudicative determination and a 'rule' under the DCAPA is a thin one[.]" [16] *Acheson v. Sheaffer*, 520 A.2d 318, 320 (D.C.1987). For that reason, it is not always easy to decide whether a policy that an agency announces through adjudication is one that may be given effect in the case in which the rule is announced. In the instant case, however, the question is not a close one. In effect, what the Board did in this case (and seeks possibly to do on remand [17]) was to impose an additional eligibility requirement for receiving a survivor's annuity under the Act, i.e., a requirement that a claimant file her application within a certain time after the deceased member's death.[18] But, in asserting the

Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (invalidating adjudicative rule that purported to establish the general principle that an employer must provide a list of employees eligible to vote in a union election within seven days after an election is approved, since the rule was quasi-legislative but had not been promulgated in accordance with APA procedures).

But see District Lodge 64, Int'l Ass'n of Machinists & Aerospace Workers v. NLRB, 949 F.2d 441 (D.C.Cir.1991), a case on which the Board relies, in which the court upheld an adjudicatory ruling by which the NLRB established that its General Counsel may not reinstate a previously dismissed unfair-labor-practices claim more than six months after the practice was alleged to have occurred, even if the claimant initially filed the claim within the six-month period. The District of Columbia Circuit held that because Congress had not "directly spoken to the precise question at issue," the NLRB "was free to adopt any reasonable construction of the Act," and to "borrow" a fixed period of limitations, whether by adjudication or by rulemaking, in order to fill a "gap" in the statutory scheme. *Id.* at 444–45. Although the case may appear to be one in which the court approved the agency's adoption of a legislative rule through adjudication, the court's decision upholding the NLRB ruling seems better explained by the fact that the NLRB adopted the rule in question as an interpretive rule explaining how the limit described in section 10(b) of the National Labor Relations Act ("No complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board.") applies in the case of a dismissed but reinstated claim. The case also is consistent with courts' willingness to allow agencies to "borrow" limitations periods to create repose on causes of action, a situation not involved here. *See* note 18, *infra*.

16. That is in part because "all types of rules, legislative and interpretive alike, may interpret 'law.'" *Cent. Tex.*, 402 F.3d at 212.

17. The Board asserts, for example, that it "might find that ... a limitations period is needed to reduce the administrative burden of maintaining records of former members long after their deaths" or might "decide to 'borrow' an established limitations period" or "devise an appropriate limitations period of its own."

18. *Cf. Hana v. Gonzales*, 503 F.3d 39, 42 (1st Cir.2007) ("To be eligible for asylum, an applicant must show by clear and convincing evidence that he filed his application within one year of arriving in the United States," as provided in 8 U.S.C. § 1158(a)(2)(B).); *Dicenzo v. Nicholson*, 21 Vet.App. 407 (2006) ("To be eligible for an EAJA award, the applicant must file the application within the 30-day time period set forth in 28 U.S.C. § 2412(d)(1)(B)....").

The Board likens its action instead to cases in which courts or agencies have implied a limitations period where none was specified in the statute that created a cause or right of action. *See, e.g., Bd. of Regents v. Tomanio*, 446 U.S. 478, 485, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980) (restating "the general principle that [where there is] no specifically stated or otherwise relevant federal statute of limitations for the federal substantive claim created by Congress[,] ... the controlling period would ordinarily be the most appropriate one provided by state law") (citation and internal quotation marks omitted); *Woodley Park Cmty. Ass'n. v. District of Columbia Bd. of Zoning Adjustment*, 490 A.2d 628, 636 (D.C.

authority to impose this additional requirement, the Board does not purport to interpret any word or phrase used in the Act, the implementing regulations, or the Board's previous decisions interpreting the Act or regulations, but instead contemplates supplementing the statute and regulations with a new substantive rule of general application. *Cf. United States v. Articles of Drug*, 634 F.Supp. 435, 457 (N.D.Ill.1985) (explaining that policies that "create precise, objective limitations where none previously existed" are substantive rules), *vacated as moot*, 818 F.2d 569, 570 (7th Cir.1987). The Board may not impose such a new requirement through adjudication, but must adopt it, if at all, in compliance with the procedures mandated by the DCAPA.

For the foregoing reasons, we vacate the Board's order, on the ground that the Board may not apply a claim-filing deadline to bar petitioner's claim.[19]

### C.

■■■ When an agency has denied an application for benefits on the basis of a legislative rule adopted without compliance with the DCAPA, we typically have re-

manded with instructions that the agency reevaluate the petitioner's application "as though the invalid regulation had not existed." *Rorie*, 403 A.2d at 1154. Petitioner urges, however, that the existing record permits us to conclude that she is entitled to survivor's benefits, and that a remand to the Board therefore is unnecessary. We are constrained to disagree.

The issue is whether petitioner comes within the statutory definition of "child," i.e., an "unmarried [person] who, because of physical or mental disability incurred before the age of 18, is incapable of self-support." Petitioner would have us rely on several documents in the record that, she asserts, indisputably establish her disability and its onset before age eighteen. There is a November 4, 1974 letter from Herbert Brandes, M.D., stating that petitioner, Dr. Brandes's patient "for about five years," is "of low mentality and has never attended regular school," has "the mentality of a child about 8 years of age," "cannot read or write nor [sic] count money, nor does she attach any value to same," and "is totally dependent upon her parents for support and care, and if they were to become deceased she would, by necessity,

1985) ("Because the rules of the BZA adopt no specific time limit on appeals, a standard of reasonableness is applied in determining whether an appeal is timely."). However, in all these cases, the courts were concerned with the time within which an aggrieved party could challenge an adverse decision or action. *See Tomanio*, 446 U.S. at 487, 100 S.Ct. 1790 (describing statutes of limitations, as "policies of repose," as "fundamental to a well-ordered judicial system"). Here, by contrast, we are concerned with whether the Board may imply a deadline for initially claiming a benefit, so these cases are not really apposite. *Withey*, another case on which the Board relies, upheld a state agency regulation that established a limitations period on claims for underpayment by AFDC recipients, but that case is distinguishable on the additional ground that it involved a limi-

tations period established through the promulgation of a regulation. 920 F.2d at 159 ("Given that Congress has not addressed the question of a limitations period, ... the 60–day limit enacted thereunder by NYSSL § 22(4) [is] reasonable.").

19. That is not to say, of course, that the Board would be precluded from determining that it is unable "to assess the merits" of petitioner's application, and therefore must deny the application, because, due to the passage of time, evidence needed to determine whether petitioner was disabled by age eighteen is unavailable. We note, however, that courts have recognized that "medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period." *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir.1984).

become institutionalized unless a relative were to take her into their home." The record also includes April 16, 2001, and April 23, 2008 documents from Dean Traiger, M.D., similarly stating that petitioner "is of low mentality and has never attended regular school," that "her cognative [sic] abilities are not consistent with her age," that she "is in fact childlike or adolescent," that without her family she "would need institutional care since she would be unable to care for her self," and that she "works to be part of society but lacks skills to manage money."

However, the record also contains a copy of a "Durable Power of Attorney" dated May 21, 2008, bearing what purports to be petitioner's signature, possibly raising an issue of whether she can in fact write (contrary to the assertion in Dr. Brandes's letter). Further, the record contains a copy of petitioner's Social Security earnings report, showing, *inter alia,* that petitioner had earnings of over $11,000 in 2006—a fact that does not necessarily negate her claim of disability, but raises at least an issue as to whether she is "capable of self-support." D.C.Code § 5–716(e)(2)(A). Resolving such factual issues "is not a proper function of an appellate court." *Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392, 404 (D.C.1991). In addition, we presume that the Board has developed a body of interpretations on when a claimant will be deemed "disabled" and "capable of self-support," another reason why the Board should have an opportunity in the first instance to make a determination about whether petitioner qualifies for survivor's benefits.

### III.

For the foregoing reasons, we reverse the Board's determination that petitioner's claim is time-barred. We remand for the Board to determine whether petitioner otherwise meets the eligibility requirements to receive survivor's benefits. We also express the hope that the Board will act upon this matter as expeditiously as possible.

*So ordered.*

SCHWELB, Senior Judge, concurring:

This is a compelling case of considerable urgency. While I agree with most of the court's opinion, I write separately to focus on the practical consequences of any unnecessary delay in disposing of Ms. Andrews' claim. In this case, as much as or more than in any other case that I have confronted in over thirty years on the bench, justice delayed is likely to prove to be justice denied. If the parties cannot reach a reasonable settlement—by far the most constructive option available—then the Board should, in my view, move with the utmost expedition towards an immediate and just resolution of Ms. Andrews' claim.

### I.

On August 28, 1983, when her father, retired Lieutenant Elmer J. Andrews of the Metropolitan Police Department, died, Pamela Susan Andrews was thirty years old. Upon his death, Ms. Andrews became entitled to receive a survivor annuity, although she was over the age of eighteen, if she was incapable of supporting herself. *See* D.C.Code § 5–716(e)(2) (2001). If Ms. Andrews qualified (or qualifies) under this statutory standard, then, as the District appropriately acknowledges in its brief, her substantive entitlement to a survivor annuity is automatic. *See Jackson v. District of Columbia Police & Firefighters' Ret. & Relief Bd.,* 717 A.2d 904, 907 (D.C. 1998).

Because the claim by Ms. Andrews which is presently before us was not filed until 2008,[1] one might reasonably anticipate difficulties in assessing Ms. Andrews' condition in 1983 and in the years that followed. "[S]tale claims present major evidentiary problems which can seriously undermine the courts' ability to determine the facts." *Farris v. Compton,* 652 A.2d 49, 58 (D.C.1994) (quoting *Tyson v. Tyson,* 107 Wash.2d 72, 727 P.2d 226, 228 (1986) (en banc)). In this instance, however, there is evidence which, at least in my view, makes an eventual finding that Ms. Andrews was disabled in 1983 (and continues to be so disabled today), and thus unable to support herself, highly probable, if not virtually certain.

The record contains an evaluation of Ms. Andrews by Herbert G. Brandes, M.D., dated November 4, 1974, almost nine years before Ms. Andrews became potentially eligible for an annuity. Dr. Brandes wrote then that Ms. Andrews, who was twenty-one years old at the time,

> is of low mentality and has never attended regular school. She has the mentality of a child about 8 years of age.

Dr. Brandes further reported that Ms. Andrews

> cannot read or write nor count money, nor does she attach any value to same. She is totally dependent on her parents for support and care, and if they were to become deceased she would, by necessity, become institutionalized unless a relative were to take her into [his or her] home.

In 2001 and 2008, Dean Traiger, M.D., Ms. Andrews' primary physician, provided evaluations on her behalf which were largely consistent with Dr. Brandes' assessment some three decades earlier. Dr. Traiger wrote in 2001 that Ms. Andrews "is of low mentality and ha[s] never attended regular school." According to Dr. Traiger, Ms. Andrews is "somewhat independent and functional in society," but her "mentality is not consistent with her age and in fact is childlike or adolescent." In 2008, Dr. Traiger executed a District of Columbia government form in which he explained that Ms. Andrews has a "moderate" learning disability. In response to the question whether Ms. Andrews was "capable of earning a livelihood," Dr. Traiger responded "No," and he added that "she wants to be part of society but lacks skills to manage money." The record thus reveals that Ms. Andrews is essentially unschooled and that, over the entire period of her adult life, she has functioned mentally like a child.

These evaluations do not stand alone. Ms. Andrews' 2008 claim was presented on her behalf by her stepmother, who is now over ninety years of age. The very fact that it was necessary to rely on an aged relative to act on Ms. Andrews' behalf provides common sense support for her claim that she is unable, especially in a complex urban society like ours, to care for or support herself.

My colleagues in the majority hold that the Board, in the first instance, must determine whether Ms. Andrews is, or has been, incapable of supporting herself. Somewhat reluctantly, I agree with a remand for that purpose. The record is not *entirely* one-sided, and because the prior litigation focused on timeliness, the facts have not been fully developed with respect to the existence or extent of Ms. Andrews' disability. Ms. Andrews has signed a durable power of attorney in favor of her stepmother, and although her ability to write her name does not demonstrate the

---

**1.** An earlier claim was filed and dismissed in 2001.

capacity to support herself, the question arises whether she understood what she signed.[2] Ms. Andrews has also earned money—over $11,000 in 2006[3]—and she has thus apparently contributed in some limited measure to her own support. While living on that level of earnings in the District of Columbia would be challenging even for a genius (and even more so for a person with the intellectual function of a child), I am constrained to agree that the Board, as the finder of fact, and as the agency charged with construing the statute which it is required by law to administer, should be given the opportunity to make a record on the issue, and to decide in the first instance whether Ms. Andrews was or is capable of self-support. I so conclude notwithstanding a measure of mystification as to how, in the context of a humanitarian and remedial statute in which close calls are to be made in favor of the claimant, *see, e.g., District of Columbia v. Tarlosky,* 675 A.2d 77, 80 (D.C.1996), an impartial trier of fact could reasonably find that someone of Ms. Andrews' apparent mental age is capable of supporting herself. I would be inclined to eschew a remand as unnecessary only if (1) the record before us were conclusive or, by imperfect but instructive analogy, would warrant a directed verdict in a jury trial on the question whether Ms. Andrews is unable to support herself; *and* (2) we could state with complete assurance that further development of the record could not conceivably alter this result. *See, e.g., In re Melton,* 597 A.2d 892, 908 (D.C.1991) (en banc) (the law does not require a remand when remanding the case would be a futile act).[4]

Obviously, we cannot dispense with findings by the trier of fact in the absence of truly extraordinary circumstances. Although this case is unusual in relation to the need for speed, I agree that it does not warrant preemption by this court of the Board's responsibility, in the first instance, to make a record, find the facts, and construe the statute.

## II.

The practical (and human) problem in this case, however, is that if the proceedings on remand take a conventional leisurely course, then even if the Board ultimately finds that Ms. Andrews is disabled and unable to support herself—and, as I have explained, such a finding is probable, if not inevitable—any legal victory that Ms. Andrews may ultimately win is likely to be a Pyrrhic one. Although the Board has acted with reasonable dispatch in addressing Ms. Andrews' claim, the fact is

---

2. The durable power of attorney is replete with technical terminology, *e.g.,* "indemnification of acts of attorney-in-fact."

3. Ms. Andrews is entitled to an annuity if she is not, or was not, able to engage in *"substantial* gainful activity." *Cf.* 42 U.S.C. § 423(f)(1)(B) (emphasis added); *Zwerling v. Office of Personnel Mgmt.,* No. 97–3132, 1997 WL 716151, at *3 (Fed.Cir. Nov. 17, 1997). As the Merit Systems Protection Board held in *Rajbhandary v. Office of Personnel Mgmt.,* 91 M.S.P.R. 192, 196, "the fact of current employment alone [does not] disqualify an applicant. Under SSA regulations, the mere fact that an applicant is employed is not necessarily disqualifying." *Id.*

4. It might be appropriate for an appellate court to decline to remand if, *e.g.,* the physicians' reports disclosed that the claimant has been a quadriplegic for the entire period which she was claiming a survivor annuity. In *In re Melton,* 597 A.2d at 908, the en banc court "decline[d] to remand the case, in spite of the trial judge's failure to make an explicit finding on the question on which the admission of the contested evidence depended," because a remand would have been futile, and because we "discern[ed] no appreciable possibility" that the judge would make a finding contrary to the one to which the record plainly pointed.

that litigation takes time. In the present case, the Board denied the claim on patently erroneous statute of limitations grounds [5] in June 2008, and the litigation of the question whether Ms. Andrews is unable to support herself has not yet even begun. During the period that has elapsed since the Board's ruling more than a year and a half ago, Ms. Andrews has received no survivor annuity. If, upon remand, the case continues to proceed at the same pace as before, it is likely to be years before the evidence has been collected and presented, the findings have been made, and any further applications for review by this court have been exhausted. It would be unfair, to say the least, to require Ms. Andrews to wait a protracted period for the vindication of an apparently meritorious claim. Moreover, we cannot even be sure whether Ms. Andrews' able counsel will be compensated and, if not, whether he will be in a position to represent her through another round of litigation. Ms. Andrews' prospects would be bleak indeed if she had to proceed without committed legal representation.

Meanwhile, Ms. Andrews's stepmother—the person who has been looking after Ms. Andrews for several years—is now over ninety years of age. One necessarily wonders how much longer the stepmother will be able to continue to care for Ms. Andrews. If she cannot, institutionalization of Ms. Andrews may be inevitable, unless funds become available to care for her at home. So far as I am aware, survivor annuity payments represent the only possible source of such funds. But if it takes two or three or even five more years to determine that Ms. Andrews is entitled to receive these benefits, then the probability is high that even a favorable determination will have come too late to protect Ms. Andrews.

A trial court or an agency may be justified in some cases in taking reasonable shortcuts. In *LaSalle Extension Univ. v. Federal Trade Comm'n,* 201 U.S.App. D.C. 22, 26, 627 F.2d 481, 485 (1980), the court stated, in discussing a slightly different but related issue:

> Notwithstanding the importance of having the district court express its conclusions with care and in adequate detail, however, we will not remand a case for more specific findings if doing so will consume precious time and judicial resources without serving any purpose. When the record as a whole reveals no substantive issue concerning a material fact, we will not elevate form over function by requiring further district court proceedings to supplement the findings. (Citations omitted). As we stated in *Hurwitz v. Hurwitz,* 78 U.S.App. D.C. 66, 136 F.2d 796 (D.C.Cir.1943), the district court's obligation to prepare adequate findings of fact is imposed primarily to assist appellate review and is "not a jurisdictional requirement of appeal." *Id.* at 799. Consequently, "[i]n cases where the record is so clear that the court [of appeals] does not need the aid of findings it may waive such a defect on the ground that the error is not substantial in the particular case."

Although this is a petition for review of agency action, rather than an appeal from a trial court ruling, the court's approach in *LaSalle* strikes me as well-suited to any future proceedings in the case at bar. Given all of the considerations that I have discussed in this opinion, and assuming that no early settlement can be achieved,[6]

---

**5.** The Attorney General of the District of Columbia has acknowledged that the Board erred in this regard, and has made no attempt to defend the Board's decision.

**6.** But see Part III of the opinion, *infra.*

I believe that on remand, the case should be placed on as fast a track as is reasonably available and that procedures should be simplified wherever possible to secure a just result as promptly as this can be achieved.[7]

### III.

Finally, I think it appropriate to add that, in the posture in which this case now finds itself, and with the clock rapidly ticking towards institutionalization, indefinite continuation of the adversarial process strikes me as less than an ideal solution.

Even if counsel for the District, or my colleagues, believe that I am prematurely overestimating the strength of Ms. Andrews' case when the Board has yet to rule on the question whether she is incapable of supporting herself, it must surely be acknowledged by any reasonable person that Ms. Andrews' claim is not frivolous. Although my colleagues may regard it as impolitic for me to say so, I am confident that they do not believe that Ms. Andrews' claim has no realistic prospects of ultimate success. Her case is also appealing from a human perspective. Surely, it has some appreciable settlement value.

With able counsel on both sides, I cannot believe that some reasonable compromise is unattainable if each party is ready to demonstrate goodwill. If a fair compromise is achieved, this might well result in the availability of some kind of care which will enable Ms. Andrews, to quote Dr. Traiger, to continue to "participate in society," which she wishes to do, without having to be institutionalized. Surely a modest (but not *too* modest) sum expended to resolve this case will be more profitable for all concerned than potentially protracted and costly continued litigation.

Over almost twenty-two years on the appellate bench, I have suggested settlement, *sua sponte*, only a handful of times and never, so far as I recall, in a written opinion. I do so in this case, however, because although "fight the good fight with all thy might" is often the best exhortation or advice, "come let us reason together" strikes me as far more appropriate here.[8] I hope for an outcome that is consistent with the law and fair to all concerned.

---

7. I recognize that this is not the only case before the Board, and that allocation of the Board's resources does not fall within the judicial function. I think it appropriate, however, to invite the Board's attention to the importance of the special circumstance which dominates this case, namely, that the claimant is being cared for by a stepmother in her nineties.

8. Even if the parties are unable to negotiate an immediate resolution of the entire claim they might explore the possibility of interim payments that would keep Ms. Andrews at home, without prejudice to their overall positions.